EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Hiram Torres Montalvo<br><br>    Peticionario<br><br>       v.<br><br>Hon. Alejandro García Padilla, Gobernador del Estado Libre Asociado de Puerto Rico<br><br>    Recurrido | 2016 TSPR 38<br><br>194 DPR \_\_\_\_ |

Número del Caso: CT-2016-3

Fecha: 7 de marzo de 2016

Abogados de la parte Peticionaria:

        Lcdo. Hiram Torres Montalvo
        Lcdo. Fernando Tarafa Irizarry
        Lcdo. Luis D. García Fraga


 Oficina de la Procuradora General:

        Lcda. Margarita Mercado Echegaray
        Procuradora General

        Lcda. Laura W. Robles Vega
        Procuradora General Auxiliar


Materia: Derecho Constitucional - Legitimación activa para presentar un caso y controversia. Facultad del Gobernador de nombrar a la Jueza Presidenta del Tribunal Supremo. Procedimiento Civil: Imposición de honorarios por temeridad. Regla 44.1 de Procedimiento Civil

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Hiram Torres Montalvo<br><br>    Peticionario<br><br>        v.<br><br>Hon. Alejandro García Padilla, Gobernador del Estado Libre Asociado de Puerto Rico<br><br>    Recurrido | **Núm. CT-2016-0003** | Certificación |

Opinión del Tribunal emitida por el Juez Asociado SEÑOR FELIBERTI CINTRÓN

(Regla 50)

En San Juan, Puerto Rico, a 7 de marzo de 2016.

> "En ocasiones el silencio dignifica, pero en otras perpetúa el abuso y la falta de respeto." Hon. Erick V. Kolthoff Caraballo, Juez Asociado, fragmento de la misiva dirigida el 23 de febrero de 2016 al Hon. Eduardo Bhatia Gautier, Presidente del Senado de Puerto Rico.

Por segunda vez en los pasados dos años, a causa del retiro de los Jueces Presidentes de este Foro, Hon. Federico Hernández Denton y Hon. Liana Fiol Matta, han surgido rumores, especulaciones y comentarios públicos sugiriendo que algunos Jueces Asociados de este Tribunal se aprestaban a dar un "golpe de estado", al estar considerando o planificando nombrar a un Juez Presidente de entre alguno de los miembros de esta Curia. No fue

suficiente para aplacar dichos rumores las declaraciones públicas realizadas por algunos de los Jueces de este Tribunal a los efectos de que los mismos eran totalmente falsos e infundados.[1] Véanse, por ejemplo, las siguientes declaraciones escritas al respecto realizadas el 4 de marzo de 2014 por el Exjuez Presidente Hernández Denton, según publicadas por el periódico *El Nuevo Día*:[2]

> Luego de dialogar con mis compañeros jueces asociados y juezas asociadas sobre este asunto, puedo afirmar que **todos** estamos de acuerdo en que es al gobernador de Puerto Rico a quien corresponde cubrir esa vacante, con el consejo y consentimiento del Senado. De la misma manera que hemos defendido las prerrogativas constitucionales de la Rama Judicial, somos deferentes y respetamos las prerrogativas constitucionales de las otras ramas de gobierno. (Énfasis nuestro).[3]

Hace apenas unos días, en ocasión del retiro de la Exjueza Presidenta Fiol Matta y la subsiguiente nominación de la Hon. Maite D. Oronoz Rodríguez, Jueza Asociada, como Presidenta de este Tribunal, por parte del Gobernador de Puerto Rico, Hon. Alejandro García Padilla, el Senado de Puerto Rico, en horas de la tarde del 22 de febrero de 2016, procedió a confirmar a la Jueza Oronoz Rodríguez como Jueza Presidenta de este Tribunal. Algunos

---

[1]     Todo esto está atado al hecho irrefutable de que el alegado "golpe de estado" antes indicado nunca se materializó al momento de finalizar la presidencia del Exjuez Presidente Hernández Denton.

[2]     Cabe señalar que ninguno de los Jueces y Juezas Asociadas de este Tribunal se expresó públicamente en momento alguno para desmentirlo.

[3]     *Romero Barceló insta a jueces a escoger al presidente del Supremo*, El Nuevo Día, http://www.elnuevodia.com/noticias/politica/nota/romerobarceloinsta ajuecesaescogeralpresidentedelsupremo-1735943/ (última visita, 6 de marzo de 2016).

expresaron que ello se basó en alegados rumores de que nuevamente un número de Jueces Asociados de este Tribunal se aprestaba a nombrar al Juez Presidente eligiéndolo de entre alguno de los miembros actuales de este Foro, aprovechando el caso que había presentado ese mismo día ante el Tribunal de Primera Instancia el aquí peticionario, Lcdo. Hiram Torres Montalvo (licenciado Torres o peticionario), aspirante a un puesto de legislador en las próximas elecciones generales.

Con este trasfondo en mente, y con el fin de ponerle punto final a este lamentable episodio y toda la vorágine desmedida y totalmente infundada de insinuación y especulación al respecto, entendemos que llegó el momento de atender este asunto de una vez y por todas.

A base de lo anterior, pasemos a repasar brevemente los hechos y el tracto procesal que dan origen al Recurso de Certificación que hoy atendemos.[4]

I

El 22 de febrero de 2016 el licenciado Torres presentó ante el Tribunal de Primera Instancia una *Demanda de Injunction Preliminar y Permanente y Solicitud de*

---

[4] Mediante un Recurso de Certificación Intrajurisdiccional este Tribunal posee la autoridad de considerar y resolver, discrecionalmente, cualquier asunto pendiente ante el Tribunal de Primera Instancia o el Tribunal de Apelaciones, cuando se presenten cuestiones noveles de derecho o se planteen asuntos de alto interés público que incluyan cualquier cuestión sustancial al amparo de la Constitución de Puerto Rico. Artículo 3.002 de la Ley Núm. 201-2003, 4 LPRA sec. 24s(f) (Sup. 2015); AMPR *et als*. v. Sist. Retiro Maestros V, 190 DPR 854 (2014); U.P.R. v. Laborde Torres y otros I, 180 DPR 253 (2010). Véanse, además, Brau, Linares v. ELA *et als*., 189 DPR 1068, 1073-1074 (2013) (Resolución); Nieves Huertas *et al*. v. ELA I, 189 DPR 611 (2013) (Sentencia); Alvarado Pacheco y otros v. ELA, 188 DPR 594 (2013) (Resolución).

*Sentencia Declaratoria*. Mediante el injunction preliminar y permanente procuraba impedir el nombramiento y confirmación de la Hon. Maite D. Oronoz Rodríguez como Jueza Presidenta de este Tribunal. Por otro lado, por medio del mecanismo de sentencia declaratoria le solicitó a dicho foro que decretara que no existe fundamento alguno en la Constitución de Puerto Rico para delegar en la figura del Gobernador de Puerto Rico el poder de nominar al Juez Presidente de esta Curia y, a la par, que reconociera que dicha función recae en los Jueces Asociados.

Ese mismo día, en horas de la tarde, el Senado de Puerto Rico confirmó a la Hon. Maite D. Oronoz Rodríguez como Jueza Presidenta de este Foro. Inconforme con tal proceder, el 25 de febrero de 2016 el licenciado Torres presentó ante nos un Recurso de Certificación Intrajurisdiccional. Solicitó que dejemos sin efecto el nombramiento de la Jueza Presidenta, Hon. Maite D. Oronoz Rodríguez, y que promulguemos un reglamento interno para la selección del Juez Presidente de esta Curia. Fundamentó su solicitud en la premisa de que la Constitución de Puerto Rico no dispone un mecanismo para la selección del Juez Presidente. Adujo, además, que aunque a través de los años se ha consentido que sea el Gobernador, con el consejo y consentimiento del Senado, quien nombre al Juez Presidente, dicho procedimiento no tiene sustento legal en nuestra Constitución, ni en

jurisprudencia alguna, además de que "vulnera las nociones más elementales de democracia y de sana administración que debe imperar en todo el Gobierno de Puerto Rico, incluyendo en sus Tribunales de Justicia […]".[5]

Cuatro días más tarde, es decir, el 29 de febrero de 2016, el Gobierno de Puerto Rico compareció ante nos, por conducto de la Procuradora General, solicitando que certifiquemos e invoquemos nuestras prerrogativas bajo la Regla 50 del Reglamento de este Tribunal (**Regla 50**),[6] con el propósito de que desestimemos la Demanda presentada por el licenciado Torres ante el foro primario. Aludió, en primera instancia, que el peticionario no ostenta legitimación activa para: (1) solicitar que se anule un nombramiento judicial, (2) abogar por la facultad de los miembros de este Foro para nombrar al Juez o Jueza Presidenta y (3) solicitar que este Tribunal adopte reglamentación interna para dicho propósito. Adujo, además, que la controversia no es justiciable por tratarse de una cuestión política, cuyo remedio atenta contra la separación de poderes, y porque con la confirmación de la Hon. Maite D. Oronoz Rodríguez como Jueza Presidenta, la solicitud de interdicto advino académica.[7] Por último

---

[5]     Recurso de Certificación Intrajurisdiccional presentado ante nos por el Lcdo. Hiram Torres Montalvo el 25 de febrero de 2016, pág. 4.

[6]     Regla 50 del Reglamento del Tribunal Supremo de Puerto Rico, 4 LPRA Ap. XXI-B, R. 50 (2012).

[7]     Como veremos más adelante, dado el resultado al que arribamos, se hace innecesario que discutamos todos los argumentos señalados por el Gobierno en su *Urgente Solicitud de Desestimación*.

alegó que, de todos modos, la Demanda no presenta una cuestión constitucional sustancial en los méritos. Para ello fundamentó su postura en que el texto de nuestra Constitución es claro al disponer que el poder de nombrar a todos los jueces en Puerto Rico recae en el Gobernador con el consejo y consentimiento del Senado. Lo anterior, añadió, fue avalado por la clara intención de la Convención Constituyente de preservar el método de nombramiento y confirmación por las ramas políticas del Gobierno, y por nuestra tradición e historia constitucional.

Para disponer de este asunto, expedimos el auto de certificación y lo atendemos sin trámite ulterior conforme a la Regla 50. Veamos.

II

El peticionario no tiene legitimación activa para incoar este pleito. No ha demostrado que tiene un interés propio adverso que se vería afectado por el nombramiento de la Jueza Presidenta.

Los tribunales estamos llamados a intervenir solo en casos justiciables. E.L.A. v. Aguayo, 80 DPR 552 (1958). El principio de justiciabilidad requiere que exista una controversia genuina, entre partes antagónicas, que permita adjudicarla en sus méritos y conceder un remedio con efecto real sobre la relación jurídica. Asoc. Fotoperiodistas v. Rivera Schatz, 180 DPR 920 (2011). "En vista de que la justiciabilidad es una doctrina

autoimpuesta, los propios tribunales deben preguntarse y evaluar si es o no apropiado entender en un determinado caso, mediante un análisis que les permite ejercer su discreción en cuanto al límite de su poder constitucional". Íd., pág. 931, citando a Smyth, Puig v. Oriental Bank, 170 DPR 73, 76 (2007) (Resolución) (Voto de Conformidad emitido por el Juez Presidente señor Hernández Denton).

Una controversia no es justiciable, en lo pertinente, si uno de los litigantes carece de legitimación activa. Una parte posee legitimación activa si demuestra: "(1) que ha sufrido un daño claro y palpable; (2) que el daño es real, inmediato y preciso, y no abstracto o hipotético; (3) que existe una conexión entre el daño sufrido y la causa de acción ejercitada, y (4) que la causa de acción surge bajo el palio de la Constitución o de una ley". Hernández Torres v. Gobernador, 129 DPR 824, 836 (1992). El interés de la parte, distinto al interés general que pueda tener cualquier ciudadano, debe ser especial y particularizado. Col. Ópticos de P.R. v. Vani Visual Center, 124 DPR 559 (1989).

Luego de analizar la escueta justificación utilizada por el peticionario con el fin de que se le reconozca legitimación activa y de estudiar con detenimiento el derecho aplicable, concluimos que, entre otras, éste no ha demostrado haber sufrido un daño claro, palpable, inmediato y preciso, ni ha particularizado un interés real

y sustancial para promover el presente pleito. Es decir, el interés que alegó tener es uno generalizado e insuficiente.

Conforme a lo también manifestado por esta Curia en Nieves Huertas v. ELA I, 189 DPR 611 (2013) (Sentencia), la preocupación que pueda tener el licenciado Torres por la sana administración de los tribunales, como abogado de profesión, no le confiere autoridad legal para cuestionar la legitimidad de un nombramiento judicial. Como bien señaló la Procuradora General en su *Urgente Solicitud de Desestimación*, el peticionario no ha establecido tener autoridad en ley para solicitar que se anule el nombramiento judicial de la Jueza Presidenta, ni para abogar por la presunta facultad de los miembros de este Tribunal de elegir a su Presidenta o Presidente. Esto nos lleva a concluir que el licenciado Torres no posee legitimación activa, lo que de ordinario nos conduciría a abstenernos, prudencialmente, de entrar en los méritos de este asunto. Véanse, por ejemplo, Acevedo Vilá v. Meléndez, 164 DPR 875 (2005) y Fuster v. Busó, 102 DPR 327 (1974) (*Per Curiam*).

No obstante, tal y como hicimos en Nieves Huertas *et al.* v. ELA I, *supra*, donde también se cuestionó, entre otros, la legitimidad de unos puestos judiciales, y **en consideración al alto interés público que reviste el asunto ante nos**, entendemos necesario adentrarnos finalmente en los méritos de esta controversia de manera

inmediata.    Igual  que  entonces,  la  legitimidad  de  los

funcionarios  que  ocupan  cargos  públicos  y,  en  particular,

una  de  las  integrantes  de  este  Tribunal,  exige  que

rescatemos  la  dignidad  de  la  Institución.    La  legitimidad

de  nuestros  procesos  democráticos  y  de  este  Foro,  atacada

por  varios  flancos,  amerita  una  expresión  de  este

Tribunal.

Lo  que  habremos  de  dilucidar  es  lo  siguiente:  **¿En
quién  recae  la  autoridad  de  nombrar  al  Juez  o  la  Jueza
Presidenta  del  Tribunal  Supremo  de  Puerto  Rico?**

III

**A. Texto  de  la  Constitución  de  Puerto  Rico**

A  partir  de  la  instauración  de  un  gobierno  civil  en

la  Isla  en  el  año  1900,  la  facultad  de  llevar  a  cabo  la

designación  del  Juez  Presidente  y  los  Jueces  Asociados  del

Tribunal  Supremo  de  Puerto  Rico  recaía  única  y

exclusivamente  en  el  Presidente  de  los  Estados  Unidos;  es

decir,  en  el  poder  ejecutivo.    Véanse,  31  Stat.  84,

Sección  33  de  la  Ley  Foraker,  Documentos  Históricos,  1

LPRA  (2008),  y  39  Stat.  965,  Sección  40  de  la  Ley  Jones,

Documentos  Históricos,  1  LPRA  (2008).[8]    Dicho  nombramiento

tenía  que  contar  con  el  aval  del  Senado  Federal.    Una  vez

aprobada  la  Constitución  de  Puerto  Rico  en  el  año  1952,

---

[8]    La  Ley  del  Gobernador  Electivo  de  1947  dejó  intacta  la  facultad
compartida  entre  ambas  ramas  del  gobierno  de  los  Estados  Unidos.  Ley  Pública
Núm.  362  del  5  de  agosto  de  1947,  61  Stat.  770.    No  fue  hasta  la  aprobación  de
nuestra  Constitución  que  el  Gobierno  Federal,  mediante  la  figura  del
Presidente  y  el  Senado,  dejó  de  tener  injerencia  en  la  designación  de  los
jueces  de  este  Foro.

este poder presidencial quedó derogado. La autoridad nominadora de todos los miembros de la Rama Judicial fue traspasada al Gobernador.

El Artículo V de nuestra Constitución erige el Poder Judicial de Puerto Rico, ejercitado por su Máximo Foro, el Tribunal Supremo, y por aquellos otros tribunales creados al amparo de un estatuto. Art. V, Sec. 1, Const. PR, LPRA, Tomo 1 (2008). Según expresamente dispuesto en la Sección 3 del Artículo V de la Constitución de Puerto Rico:

> El Tribunal Supremo será el tribunal de última instancia en Puerto Rico y se compondrá de un juez presidente **y** cuatro jueces asociados. El número de sus jueces sólo podrá ser variado por ley, a solicitud del propio Tribunal Supremo. (Énfasis nuestro). Art. V, Sec. 3, Const. PR, LPRA, Tomo 1 (2008). Véase, además, Art. 3.001 de la Ley Núm. 201-2003, 4 LPRA sec. 24r (Sup. 2015).[9]

**La Constitución creó expresamente el cargo de Juez Presidente como uno distinto al de Juez Asociado.** La razón para ello es evidente: el Juez Presidente tiene funciones constitucionales expresas que no tienen los Jueces Asociados del Tribunal Supremo. La figura del Juez Presidente es una central en la dirección y gobernanza de los tribunales del país. Así pues, la Sección 7 del Artículo V de la Constitución de Puerto Rico establece que

---

[9] A solicitud de este Tribunal, a partir del año 2011 el número de Jueces Asociados aumentó a ocho (8), por lo que en la actualidad, junto al cargo de la Jueza Presidenta, son nueve (9) los miembros de nuestro Máximo Foro. Véanse, In re Solicitud Aumentar Núm. Jueces TS, 180 DPR 54 (2010) (Resolución) y Art. 3.001 de la Ley Núm. 201-2003, 4 LPRA Sec. 24r (Sup. 2015).

"[e]l Juez Presidente dirigirá la administración de los tribunales y nombrará un director administrativo, quien desempeñará su cargo a discreción de dicho magistrado". Art. V, Sec. 7, Const. PR, LPRA, Tomo 1 (2008). Cónsono con lo anterior, la precitada disposición le asigna al Juez Presidente la responsabilidad constitucional de dirigir la organización interna de esta Curia, además del funcionamiento y dirección administrativa de toda la Rama Judicial. Véanse, Arts. 2.012-2.016 de la Ley Núm. 201-2003, 4 LPRA Secs. 24j-24n (2010 y Sup. 2015).

La Sección 4 del Artículo IV de la Constitución de Puerto Rico, concede al Gobernador el poder de nombrar a todo funcionario para el cual esté autorizado por virtud de su propio texto o por ley. Art. IV, Sec. 4, Const. PR, LPRA, Tomo 1 (2008). En cuanto al proceso de nombramiento de los jueces, la Sección 8 del Artículo V, dispone claramente que:

> **Los jueces serán nombrados por el Gobernador con el consejo y consentimiento del Senado. Los jueces del Tribunal Supremo no tomarán posesión de sus cargos hasta que sus nombramientos sean confirmados por el Senado** y los desempeñarán mientras observen buena conducta. [...]. (Énfasis nuestro). Art. V, Sec. 8, Const. PR, LPRA, Tomo 1 (2008).

El texto diáfano del aludido precepto constitucional hace referencia al proceso de nombramiento de todos los jueces de nuestra jurisdicción. Este esquema constitucional que atribuye al ejecutivo el poder de nombrar a los jueces con la anuencia de la cámara alta de

la Asamblea Legislativa, adopta la doctrina de separación de poderes. Integra un sistema de pesos y contrapesos que sirve para evitar la concentración de autoridad en una sola rama, a la vez que le infunde un espíritu democrático al proceso de nombramientos, en la medida en que son las ramas políticas elegidas por el Pueblo las que, trabajando interdependientemente, comparten esa obligación constitucional. Sobre la doctrina de separación de poderes, véanse, Misión Ind. P.R. v. J.P., 146 DPR 64 (1998) y Banco Popular, Liquidador v. Corte, 63 DPR 66 (1944).

Este método de designación, incluye, sin ambages, los puestos de Juez Presidente y Juez Asociado de este Foro. La letra de nuestra Ley Suprema no hace distinción alguna entre el proceso que debe regir el nombramiento del Juez Presidente de este Tribunal y el proceso para nombrar al resto de los jueces del país. Siendo así, no existe espacio para validar otra interpretación de ese precepto normativo. Esta lectura del texto constitucional es cónsona con el esquema de la Sección 2 del Artículo II de la Constitución de los Estados Unidos, la cual atribuye al Presidente de la Unión Americana, con el consejo y consentimiento del Senado Federal, el poder de nombrar, entre otros funcionarios, a los jueces del Tribunal Supremo Federal. Art. II, Sec. 2, Const. EE.UU., LPRA, Tomo 1 (2008).

Asimismo, queda avalada por el contenido mismo de los debates de la Asamblea Constituyente, de los cuales no surge que se haya planteado otro mecanismo particular para elegir el cargo de Juez Presidente de este Foro. Véase, 1 Diario de Sesiones de la Convención Constituyente de Puerto Rico 180 y siguientes (1951-1952). Por consiguiente, para nombrar a una persona al cargo de Jueza o Juez Presidente se sigue el mismo método que se utiliza para nombrar a los Jueces Asociados: nominación por el Gobernador y confirmación por el Senado. "*Cuando la ley es clara libre de toda ambigüedad, la letra de ella no debe ser menospreciada bajo el pretexto de cumplir su espíritu*". Art. 14 del Código Civil de Puerto Rico, 31 LPRA sec. 14 (2015).

## B. Historia Constitucional

Del Informe de la Comisión de la Rama Judicial rendido a la Convención Constituyente surge que se ponderaron varias alternativas antes de seleccionar el método de designación de los jueces que rige en nuestra Constitución:

> La comisión recomienda que se retenga en esta constitución la forma de selección tradicional en el sistema judicial de Puerto Rico. La comisión **consideró cuidadosamente otras formas de selección de jueces**, a saber, la elección directa de los mismos, el sistema auspiciado por la *American Bar Association* adoptado en [Missouri] y diversas proposiciones sobre sistemas de nombramientos mediante la intervención de un consejo judicial. […]
>
> ........

**Aceptándose generalmente, que el sistema de selección por nombramiento es el más adecuado, la Comisión no ve razón alguna para que se altere la tradición puertorriqueña a este respecto**. (Énfasis suplido). 4 Diario de Sesiones de la Convención Constituyente de Puerto Rico (Informe de la Comisión de la Rama Judicial) 2610-2611 (1951-1952) (Ed. Conmemorativa 2003).

La Asamblea Constituyente consideró diversas enmiendas a esta sección. Por ejemplo, ponderó que fuese un Consejo Judicial de nueve miembros el que recomendara al Ejecutivo una terna de candidatos para cubrir los cargos de jueces. 1 Diario de Sesiones, *supra*, págs. 182-183.[10] Otra posible enmienda a la misma sección concibió la selección de jueces al Tribunal Supremo por voto directo del Pueblo.[11] Íd., págs. 186-187. Ninguna de estas propuestas tuvo acogida entre la mayoría de los delegados de la Asamblea Constituyente.

Surge diáfanamente del debate que llevaron a cabo los redactores de nuestra Constitución, que su intención era continuar con el mecanismo de selección de los jueces por designación del Ejecutivo, contando con el consejo y

---

[10] Así fundamentó su oposición el delegado señor Gutiérrez Franqui en el debate del 3 de diciembre de 1951:

> Eso […] sería divorciar la selección de los jueces del proceso político de un pueblo, para entregarlos a […] una clase, que es la clase profesional, que tiene que postular ante esos mismos jueces. […]
>
> ........
>
> Yo no puedo concebir que ése sea el sistema ideal en una democracia. […]. 1 Diario de Sesiones de la Convención Constituyente de Puerto Rico 184 (1951-1952).

[11] Otra de las enmiendas propuestas sugirió la intervención de los dos organismos legislativos en el proceso de confirmación de los jueces. 1 Diario de Sesiones, *supra*, pág. 632.

consentimiento del Senado, para sujetar el proceso al principio de representatividad democrática.

## C. El Nombramiento Directo por los Miembros del Tribunal

En los estados de la Unión Americana coexisten diversos mecanismos que rigen el proceso de nombramiento del juez a cargo de presidir el tribunal de más alta jerarquía de cada una de esas jurisdicciones.[12] Sin embargo, en todos aquellos estados en donde se le ha delegado a los jueces asociados del más alto foro la potestad de elegir de entre ellos el puesto de presidente, **esta directriz surge de un mandato constitucional claro, directo y explícito.**[13]  L. Rivera Méndez, Chief Justice of

---

[12]  Entre los mecanismos que coexisten en los diversos estados de la Unión Americana para escoger al Juez Presidente de los más altos foros están: (1) el nombramiento o designación por parte del poder ejecutivo; (2) la elección por el voto popular; (3) la selección por antigüedad de entre sus miembros; (4) por designación legislativa; (5) por nominación de una comisión judicial especializada, y (6) por elección de entre los propios jueces asociados.  L. Rivera Méndez, Chief Justice of Puerto Rico´s Supreme Court: A Gubernatorial Appointment or a Court Election?, 84 REV. JUR. UPR 1077, 1087-1094 (2015).

[13]  Los estados que siguen este proceso particularizado de selección al cargo de Juez Presidente son: Alaska, Arizona, Colorado, Florida, Georgia, Idaho, Illinois, Iowa, Kentucky, Michigan, Missouri, New Mexico, North Dakota, Oklahoma, Oregon, South Dakota, Tennessee, Utah, Virginia, Washington, Wyoming y West Virginia.  L. Rivera Méndez, supra, pág. 1092.

Tomando por ejemplo la Constitución de Alaska, su texto fija que:

.......

(b) The chief justice **shall be selected from among the justices of the supreme court by a majority vote of the justices.** His term of office as chief justice is three years. […]. (Énfasis nuestro).  Art. IV, Sec. 2, Const. Alaska.

Asimismo, la Constitución del estado de Illinois establece que los Jueces del Tribunal Supremo "**shall select a Chief Justice from their number** to serve for a term of three years".  (Énfasis nuestro).  Art. VI, Sec. 3, Const. Illinois.  Por último, la ley suprema de Florida también prescribe que "[t]he chief justice of the supreme court **shall be chosen by a majority of the members of the court** […]".  Art. V, Sec. 2(b), Const. Florida.

Todo lo anterior es consistente, en nuestro caso, con la elección del cargo de presidente, tanto de la Cámara como del Senado de Puerto Rico.  Dicha autoridad reside en los miembros de su mismo cuerpo legislativo.  Así lo fija taxativamente la letra de la Constitución de Puerto Rico:

_Puerto Rico´s Supreme Court: A Gubernatorial Appointment_
_or a Court Election?_, 84 REV. JUR. UPR 1077, 1092-1093
(2015).

IV

Un rumor se utilizó para crear una controversia
totalmente ficticia sobre un acto que los Jueces y Juezas
Asociadas de este Tribunal <u>no</u> podemos realizar.  Dichas
expresiones "instituyen un ataque infundado, vicioso e
injusto a esta Institución y, como tal, minan la confianza
que precisa tener nuestro amado Pueblo en nuestra forma
republicana de gobierno."[14]   Constituyen, además, "un
atentado    contra    la    plenitud    de    la    democracia
puertorriqueña,    cuyas    repercusiones    negativas    se
extenderán irremediablemente y quedarán perpetuadas para
la historia."[15]

Puesto que los planteamientos del peticionario
surgieron dentro del marco de dicha controversia jurídica
y por constituir los mismos un ataque directo a la
**legitimidad** del cargo que ocupa la figura que preside y

_____
Cada cámara elegirá un presidente de entre sus miembros
respectivos.  Art. III, Sec. 9, Const. PR, LPRA, Tomo 1 (2008).

Abona a nuestra conclusión que los delegados no incluyeron un lenguaje
similar para la designación del Juez Presidente del Tribunal Supremo.  No lo
hicieron porque expresamente asignaron al Gobernador esa facultad.

[14]    Fragmento de la misiva dirigida al Hon. Eduardo Bhatia Gautier,
Presidente del Senado de Puerto Rico, por el Hon. Erick V. Kolthoff Caraballo,
Juez Asociado, el 23 de febrero de 2016.

[15]    Fragmento de la carta enviada a los Presidentes de los Cuerpos
Legislativos de Puerto Rico, Hon. Eduardo Bhatia Gautier, Presidente del
Senado y Hon. Jaime Perelló Borrás, Presidente de la Cámara de Representantes,
por el Hon. Luis F. Estrella Martínez, Juez Asociado, el 26 de febrero
de 2016.

administra la Rama Judicial; además de por cómo ello repercute en la estabilidad de los cimientos de uno de los poderes constitucionales del Gobierno, no existe razón alguna para concederle a este asunto un curso distinto al otorgado al caso de Nieves Huertas *et al*. v. ELA I, *supra*, en el cual también se cuestionaba la legitimidad del cargo ocupado por funcionarios judiciales.

Por lo tanto, entendemos que además de prudente, es necesario que atendamos inmediatamente los méritos de la controversia ante nos, pues no hacerlo propendería a que se debilite la confianza del Pueblo puertorriqueño en su sistema de justicia, además de que perpetuaría una grave injusticia sobre la persona que recién asumió las riendas para presidir este Foro.

De ese modo y luego de analizar el asunto en los méritos, rechazamos vehementemente los planteamientos esgrimidos por el peticionario en torno a la inexistencia en nuestra Constitución de un procedimiento para nombrar al Juez Presidente de este Tribunal, por encontrarlos desacertados e inmeritorios. Sobre el particular, sostenemos que los preceptos constitucionales antes esbozados claramente reafirman y respaldan lo que ha quedado plasmado en los anales de nuestra historia constitucional. Esto es, que son las ramas políticas del gobierno, entiéndase el Gobernador y el Senado, quienes ostentan la autoridad de nombrar el primero, con el consejo y consentimiento del segundo, a todos y todas los

jueces y juezas de Puerto Rico, lo que sin lugar a dudas incluye el puesto de Jueza o Juez Presidente del Tribunal Supremo.

Reconocemos la voluntad de los padres de nuestra Constitución al redactar la Ley Suprema, la cual venimos llamados a interpretar y a defender; y respetamos su intención, según la misma ha quedado perpetuada en el Diario de Sesiones de la Convención Constituyente y en la letra diáfana de sus disposiciones. Como Jueces no podemos hacer otra cosa.

Lo que ha pretendido establecer el peticionario, mediante argumentos ostensiblemente frívolos, no tiene cabida en nuestro ordenamiento jurídico. Esto es así, pues, tanto la claridad en el contenido de los preceptos constitucionales citados, así como la evidente intención de la Asamblea Constituyente al redactarlos, no dejan margen a dudas de que en nuestro ordenamiento jurídico los nombramientos a los puestos de Juez Presidente y Juez Asociado de este Tribunal recaen en nuestras ramas hermanas, esto es, en la Rama Ejecutiva y en la Rama Legislativa.

En cuanto a esta Curia se refiere, dentro de las disposiciones constitucionales atinentes a la Rama Judicial, la Constitución de Puerto Rico expresamente reconoce la existencia de un puesto de Juez Presidente y varios puestos de Jueces Asociados. Se trata de puestos separados y distintos, con deberes específicos. Algunas

de esas facultades constitucionales son exclusivas del cargo de Juez Presidente. La Constitución de Puerto Rico igualmente establece que todos los jueces en Puerto Rico serán nombrados por el Primer Ejecutivo, con el consejo y consentimiento del Senado. Es decir, la Constitución de Puerto Rico, como es el caso en otras jurisdicciones, no permite que las Juezas o los Jueces Asociados escojan al Juez que tendrá la encomienda de dirigir la Rama Judicial.

Es menester señalar que al igual que la Constitución de Puerto Rico, la Constitución de los Estados Unidos faculta al Primer Mandatario de la Nación Americana, con el consejo y consentimiento de la Cámara Alta, a ejercer la encomienda de nombrar a todos los jueces que compondrán la judicatura federal.[16] No obstante, existen jurisdicciones estatales que han adoptado metodologías disímiles a la imperante en la nuestra para realizar dicha selección. De un estudio de las mismas hallamos que en aquellas jurisdicciones en las que se le reconoció la facultad a los Jueces Asociados de escoger de entre alguno de sus miembros la persona que habría de presidir el máximo foro judicial, dicho proceso quedó plasmado de manera expresa en sus respectivas constituciones.

En cambio, en otras jurisdicciones de los Estados Unidos el texto del aludido precepto constitucional es similar al nuestro.

---

[16]    Art. II, Sec. 2, Const. EE.UU., LPRA, Tomo 1 (2008).

> In six of these state constitutions, [Connecticut, Nebraska, Rhode Island, California, Maine and Massachusetts] the power to appoint the chief justice is afforded to the governor in very broad and general terms. What this means is that these constitutions do not state explicitly that the governor will appoint the chief justice. **They only provide the governor with a sweeping mandate that affords him power to appoint all judges of the supreme court**, or even a broader mandate allowing him to appoint all judicial officers of the state. […] The design of the mandate contained in the Federal Constitution affording the President with the power to appoint judges of the Supreme Court is similar to the ones found in these constitutions. (Énfasis suplido). L. Rivera Méndez, *supra*, pág. 1089.

Dos de estas Constituciones, la del estado de Maine y la del estado de Massachusetts, sirvieron de precedente para la redacción de la hoy Sección 8 del Artículo V de la Constitución de Puerto Rico. Véase, 4 Diario de Sesiones, *supra*, pág. 2611.

Por último, a diferencia de lo que argumenta el peticionario en torno a que el nombramiento del Juez Presidente por las ramas políticas del gobierno "vulnera las nociones más elementales de democracia", de las discusiones contenidas en el Diario de Sesiones de la Convención Constituyente surge palmariamente que lo que se pretendió al conservar dicho método de nombramiento y selección por nuestras ramas hermanas fue precisamente infundir dicho proceso de garantías democráticas. La importancia de la intervención de las demás ramas en esta selección es más patente aún cuando tenemos en cuenta que el Juez Presidente, más allá de velar por las necesidades

internas de los distintos tribunales, lidera una rama constitucional del gobierno. "La distribución entre el [Senado] y el Ejecutivo del poder para efectuar nombramientos es uno de los ejemplos más claros de los esfuerzos de los forjadores de la Constitución por incorporar a ese documento un delicado sistema de frenos y contrapesos consecuente con su particular visión de la teoría de separación de poderes." R. Serrano Geyls, Derecho Constitucional de Estados Unidos y Puerto Rico, Vol. I, Ed. Colegio de Abogados de Puerto Rico, 1986, pág. 605.

Conforme a todo lo antes enunciado y reconociendo que la Constitución de Puerto Rico preceptúa de forma **clara y expresa** a quién le corresponde el nombramiento del cargo de Juez Presidente de este Tribunal, no avalamos ni daremos curso a las pretensiones del peticionario según contenidas en su Recurso de Certificación Intrajurisdiccional. En su lugar, desestimamos la Demanda presentada por el licenciado Torres ante el Tribunal de Primera Instancia por ser palmariamente inmeritoria.

Con la Opinión que antecede, despejamos toda duda infundada y dejamos patentemente claro que el nombramiento del Juez Presidente o de la Jueza Presidenta del Tribunal Supremo de Puerto Rico le corresponde al Gobernador de Puerto Rico, con el consejo y consentimiento del Senado. Así lo provee de manera taxativa la Constitución de

Puerto Rico y así lo determina este Tribunal, sin lugar a futura especulación.

Nuevamente, "*[q]uienes presumieron la existencia de una agenda escondida por parte de miembros de este Tribunal, quedan hoy desmentidos.*" (Énfasis en el original). <u>Trinidad Hernández *et al*. v. ELA *et al*</u>., 188 DPR 828, 841 (2013) (Opinión de Conformidad emitida por el Juez Asociado señor Feliberti Cintrón, a la que se unió el Juez Asociado señor Martínez Torres).

V

La Regla 44.1(d) de Procedimiento Civil, 32 LPRA Ap. V (2010) (Regla 44.1(d)), autoriza al tribunal a imponer el pago de honorarios de abogado a una parte o su abogado que ha actuado con temeridad o frivolidad en el trámite de un proceso judicial. En lo pertinente, este precepto dispone:

> En caso que cualquier parte o su abogado o abogada haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia al responsable el pago de una suma por concepto de honorarios de abogado que el tribunal entienda correspondan a tal conducta. En caso que el Estado Libre Asociado de Puerto Rico, sus municipios, agencias o instrumentalidades haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia una suma por concepto de honorarios de abogado, excepto en los casos en que esté expresamente exento por ley del pago de honorarios de abogado.

El concepto de temeridad es uno amplio. Se ha descrito como un comportamiento que incide en los procesos judiciales y afecta, tanto el buen funcionamiento de los

tribunales, como la administración de la justicia. Meléndez Vega v. El Vocero de PR, 189 DPR 123 (2013). El mecanismo provisto en la Regla 44.1(d) tiene como propósito "'establecer una penalidad a un litigante perdidoso que por su terquedad, obstinación, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente, a asumir las molestias, gastos, trabajo e inconveniencias de un pleito'". Andamios de PR v. Newport Bonding, 179 DPR 503, 520 (2010), citando Fernández v. San Juan Cement Co., Inc., 118 DPR 713, 718 (1987). Véanse, además, Maderas Tratadas v. Sun Alliance *et al.*, 185 DPR 880, 925-926 (2012); C.O.P.R. v. S.P.U., 181 DPR 299, 342 (2011).

Una vez el tribunal determina que se incurrió en tal conducta, viene obligado a imponer el pago de los honorarios a favor de la parte que prevalece en el pleito. Meléndez Vega v. El Vocero de PR, *supra*; Maderas Tratadas v. Sun Alliance *et al.*, *supra*. El tribunal determinará la suma específica a concederse dependiendo del grado o intensidad de tal conducta. Meléndez Vega v. El Vocero de PR, *supra*.

Así pues, conforme a la normativa procesal aplicable, aquel que promueve una acción frívola, con total ausencia de fundamento legal que la apoye, se expone a ser penalizado.

Según mencionamos anteriormente, los argumentos del peticionario no están amparados en ninguna interpretación

plausible de nuestra Constitución y resultan totalmente infundados. Tampoco se ha demostrado que la acción de las ramas hermanas afectara adversamente al licenciado Torres. Rechazamos vehementemente cualquier intento de escudarse detrás de supuestos derechos constitucionales para propiciar un litigio que, a todas luces, es inmeritorio.

No vamos a permitir que personas sin legitimación activa utilicen los procedimientos judiciales para entablar pleitos frívolos en medio de una campaña primarista. Esta práctica de valerse de los tribunales para adelantar intereses políticos particulares sin base en derecho alguna tiene que cesar. Para eso existe el foro público. Los recursos de la Rama Judicial no están disponibles como plataforma mediática para promover candidaturas políticas, mientras en el proceso se pone en entredicho la legitimidad de nombramientos como, en este caso, el de la Jueza Presidenta, lacerando de paso la imagen de esta Institución.

Resolvemos, por lo tanto, que procede imponerle a la parte peticionaria el pago de honorarios de abogado por la cantidad de $5,000 a favor del Estado por iniciar y persistir en una reclamación totalmente frívola que atenta contra el mejor funcionamiento de este Tribunal y la Rama Judicial.

VI

Por los fundamentos que anteceden, se expide el auto de certificación y resolvemos que el peticionario carece

de legitimación activa para instar la *Demanda de Injunction Preliminar y Permanente y Solicitud de Sentencia Declaratoria*. Por lo tanto, sin ulterior procedimiento y al amparo de la Regla 50 del Reglamento de este Tribunal, se declara Con Lugar la *Urgente Solicitud de Desestimación* presentada por el Gobierno en el caso de autos. Se impone al peticionario el pago de honorarios de abogado por la cantidad de $5,000 a favor del Estado.

Se dictará Sentencia de conformidad.


ROBERTO FELIBERTI CINTRÓN
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Hiram Torres Montalvo<br><br>    Peticionario<br><br>        v.<br><br>Hon. Alejandro García Padilla, Gobernador del Estado Libre Asociado de Puerto Rico<br><br>    Recurrido | **Núm.** <u>**CT-2016-0003**</u> | Certificación |

**SENTENCIA**

En San Juan, Puerto Rico, a 7 de marzo de 2016.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente Sentencia, se expide el auto de certificación y resuelve que el peticionario carece de legitimación activa para instar la *Demanda de Injunction Preliminar y Permanente y Solicitud de Sentencia Declaratoria*. Por lo tanto, sin ulterior procedimiento y al amparo de la Regla 50 del Reglamento de este Tribunal, se declara Con Lugar la *Urgente Solicitud de Desestimación* presentada por el Gobierno en el caso de autos. Se impone al peticionario el pago de honorarios de abogado por la cantidad de $5,000 a favor del Estado.

**Notifíquese inmediatamente por teléfono, facsímil o correo electrónico, y notifíquese posteriormente por la vía ordinaria.**

Lo acordó el Tribunal y certifica el Secretario del Tribunal. La Juez Asociada señora Rodríguez Rodríguez, los Jueces Asociados señor Martínez Torres y señor Estrella Martínez emitieron Opiniones de Conformidad. El Juez Asociado señor Kolthoff Caraballo emitió una Opinión de Conformidad en parte y Disidente en cuanto a la Parte V. La Jueza Asociada señora Pabón Charneco y el Juez Asociado señor Rivera García emitieron Opiniones Concurrentes en parte y Disidentes en parte. La Jueza Presidenta Oronoz Rodríguez no intervino.

Juan Ernesto Dávila Rivera

Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Hiram J. Torres Montalvo<br><br>      Peticionarios<br><br>            v.<br><br>Hon.   Alejandro   García Padilla,  Gobernador  del Estado  Libre  Asociado  de Puerto Rico<br><br>      Recurridos | CT-2016-0003 | Certificación<br><br>Intrajurisdiccional |

Opinión de Conformidad emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 7 de marzo de 2016

Dada la trascendencia pública que reviste la controversia planteada por el peticionario, y puesto que ésta incide en la legitimidad constitucional de este foro, he optado por expresarme brevemente sobre la misma. Ello, sobre todo, con tal de poner de manifiesto la patente frivolidad de los argumentos presentados ante este Tribunal.

I

El 22 de febrero de 2016, el Lcdo. Hiram J. Torres Montalvo (peticionario) presentó ante el Tribunal de Primera Instancia una *Demanda de* injunction *preliminar y permanente y solicitud de sentencia sumaria*. En ésta, y en lo que al *injunction* se refiere, alegó que la confirmación de la actual Jueza Presidenta, Hon. Maite D. Oronoz Rodríguez, por parte del Senado del Estado Libre Asociado de Puerto Rico (ELA) le causaría un "daño irreparable", por lo cual solicitó que este Tribunal impidiera los procedimientos de

rigor en la cámara legislativa pertinente. Es preciso destacar, además, que el peticionario señaló que el presunto "daño irreparable" se configuraba en virtud de que éste es un abogado admitido al ejercicio de la abogacía en nuestra jurisdicción. Adujo, sin más, que ello era razón suficiente para que se le considerara "una parte directamente afectada" por el nombramiento y posterior confirmación de la Jueza Presidenta.

De otra parte, señaló que, de ser confirmada, la Jueza Presidenta Oronoz Rodríguez tendría la responsabilidad de administrar la Rama Judicial por aproximadamente treinta (30) años. Esto, en virtud de las disposiciones constitucionales que expresamente delegan en la figura del Juez Presidente tal encomienda. De la demanda presentada por el peticionario, sin embargo, no queda claro qué pertinencia, si alguna, tiene dicho hecho sobre la configuración del "daño irreparable" aducido por éste.

Por último, el licenciado Torres Montalvo solicitó que se emitiera una sentencia declaratoria en virtud de la cual se determinara que el pleno Tribunal tiene la facultad de nombrar, por sí mismo, quién ocupará el rol de Juez Presidente. Ello, dado que nuestra Constitución no dispone expresamente a quién le compete la selección de dicha figura.[17]

---

[17] Cabe destacar, además, que el peticionario indicó que la presunta laguna que contiene nuestra Constitución exige que apliquemos el artículo 7 del Código Civil, Cód. Civ. P.R. Art. 7, 31 L.P.R.A. sec. 7. Éste, como se sabe, preceptúa que cuando no haya "ley aplicable al caso, el tribunal resolverá conforme a equidad". *Id.* Esto es,

Atendida la demanda presentada por el peticionario, el foro primario emitió una orden concediéndole cinco (5) días calendarios al Gobernador del ELA, para que éste se expresara. Sin embargo, antes de que venciera el término en cuestión, el 22 de febrero de 2016, el licenciado Torres Montalvo acudió ante este Foro mediante recurso de certificación intrajurisdiccional. En éste, esencialmente, repitió los argumentos esgrimidos ante el foro primario y solicitó que este Tribunal dejara sin efecto el nombramiento de la Jueza Presidenta Oronoz Rodríguez.

El Estado, por su parte, el 29 de febrero de 2016, presentó una *Urgente solicitud de desestimación*. En ésta, invocó las doctrinas de justiciabilidad -en particular, la patente ausencia de legitimación activa- y la de cuestión política como fundamentos para desestimar el recurso incoado por el peticionario.

Hoy, este Tribunal acertadamente atiende los méritos de la controversia planteada por el peticionario y

_____

tomando en cuenta "la razón natural de acuerdo con los principios generales del derecho, y los usos y costumbres aceptados y establecidos". *Id.* Así, aludió someramente al hecho de que en otras jurisdicciones la figura del Juez Presidente es seleccionada por sus pares en pleno. Sobre tales alegaciones, baste con señalar que las mismas son palmariamente inmeritorias. En primer lugar, la invocación de la equidad consagrada en el artículo 7 del Código Civil es, a todas luces, un yerro considerable, sobre todo, cuando el asunto versa sobre cuestiones relacionadas al Derecho Constitucional estructural. No cabe, pues, hablar de equidad, más bien lo que compete es leer integralmente las disposiciones constitucionales pertinentes e interpretarlas de conformidad. De otra parte, la comparación de nuestra Constitución con sus contrapartidas estatales es improcedente, puesto que desvirtúa las particularidades propias de nuestro diseño constitucional.

rechaza sin ambages ni reserva las artificiosas teorías esgrimidas por éste.

Dado que la Jueza Presidenta Oronoz Rodríguez fue debidamente confirmada por el Senado, y posteriormente prestó juramento al cargo que ocupa, la solicitud de *injunction* hecha por el peticionario es indudablemente académica.[18] Por tanto, la controversia que aún persiste, a la luz de tales acontecimientos, es dirimir a quién le compete la facultad de nombrar la figura del Juez Presidente, según el texto de nuestra Constitución. Esto, además del tema sobre la capacidad (legitimación activa) del peticionario para instar el pleito de epígrafe.

## II

### A

Como cuestión de umbral, habría que abordar la idoneidad del recurso de certificación intrajurisdiccional en este caso, en virtud de nuestra jurisprudencia anterior, y, como señalé, la legitimación activa del peticionario para incoar el recurso que nos compete.

---

[18] En lo que respecta la solicitud de *injunction* hecha por el peticionario, basta con señalar que la Jueza Presidenta Oronoz Rodríguez no sólo fue confirmada, sino que también juramentó en su cargo, lo cual presupone que le fue entregada su comisión, la cual configura su interés propietario sobre el puesto. Ello, en cualquier caso, bien pudiera impedir la concesión de un *injunction*, puesto que, en lo pertinente, el artículo 678 del Código de Enjuiciamiento Civil expresamente prohíbe la concesión de éste "[p]ara impedir el ejercicio en forma legal de un cargo público o privado, por la persona que estuviera en posesión del mismo". Cód. Enj. Civ. Art. 678, 32 L.P.R.A. sec. 3524(5).

Recientemente, y ante una controversia análoga a la que hoy se nos solicita atender, este Tribunal, en *Nieves Huertas v. ELA I*, 189 D.P.R. 611 (2013) (sentencia), por vía del recurso de certificación intrajurisdiccional, desestimó varias causas de acción que versaban sobre la interacción de la Rama Ejecutiva y la Rama Legislativa en lo relativo al poder de nombramiento de funcionarios en la Rama Judicial. Específicamente, mediante ese recurso, se impugnaba la legalidad de los nombramientos de varios funcionarios públicos, incluyendo jueces, fiscales y procuradores. Cabe destacar que, en aquél momento, el reclamo comprendía la impugnación de los nombramientos, entre otros, del Hon. Edgardo Rivera García, Juez Asociado de este Tribunal, y de la Hon. Liza Fernández Rodríguez, Jueza del Tribunal de Primera Instancia. En *Nieves Huertas*, se acogió la certificación intrajurisdiccional, aduciendo que el pleito instado constituía "un ataque a la confianza en la Rama Judicial. . . un ataque a la convivencia pacífica y ordenada en nuestro país". *Nieves Huertas v. ELA I*, 189 D.P.R. 611, 612 (2013).

En atención a ello, se avaló el uso del mecanismo excepcional de certificación intrajurisdiccional. Se señaló, además, que los demandantes planteaban una controversia de alto interés público que, a su vez, incluía un asunto constitucional sustancial. *Id.* en la pág. 613. Todo lo cual requería, en aquél momento, "la intervención inmediata de este Tribunal". *Id.* en la pág.

612. Más aun, y en lo pertinente a la controversia que atendemos hoy, se manifestó, sin ambages, lo siguiente:

> No podemos ignorar que los nombramientos de funcionarios de la Rama Ejecutiva y de la Rama Judicial están revestidos del más alto interés público. Estos deben ser conforme a los procesos establecidos. **La falta de atención inmediata a los reclamos de los demandantes socavaría irremediablemente la confianza depositada del pueblo en nuestro sistema de justicia y mancillaría la reputación de los funcionarios que dedican su vida al servicio público.**
>
> *Id.* en la pág. 613.

Es decir, dado que los nombramientos de funcionarios a la Rama Judicial, en aquél momento los del Hon. Edgardo Rivera García, Juez Asociado de este Tribunal y la Hon. Liza Fernández, Jueza Superior del Tribunal de Primera Instancia, inciden directamente en la legitimidad de nuestro Estado de Derecho, era imprescindible dirimir la validez de los reclamos de inconstitucionalidad planteados por los demandantes en aquella ocasión.

El proceder de una mayoría de este Tribunal ante el recurso de certificación que hoy atendemos ha de ser consistente con el discurso suscrito en *Nieves Huertas*. Un curso de acción distinto por parte de este Tribunal se revelaría incomprensible. Tanto entonces, como ahora, reclamos de inconstitucionalidad de la naturaleza planteada en este caso merecen la atención inmediata de este Foro. Ello, puesto que desatender tal reclamo podría socavar la confianza del Pueblo en nuestro sistema judicial. Asimismo, tanto entonces como hoy, resulta preciso vindicar la legalidad del nombramiento de un

integrante de este Foro; en este caso, la Hon. Maite Oronoz Rodríguez, quien fue nombrada por el Gobernador de Puerto Rico y confirmada por el Senado para la vacante de Jueza Presidenta. Nuevamente, es imperativo darle a este caso el mismo trato que se le dio a la controversia tratada en *Nieves Huertas*.

Desatender una controversia que amenaza los cimientos de nuestro sistema republicano de gobierno, que conculca los postulados más básicos de la doctrina de separación de poderes y que, claramente, contraviene el texto de nuestra Constitución es un curso de acción improcedente. Por tal razón, estimo que, en esta ocasión, corresponde a este Tribunal esclarecer un asunto de tan alto interés público como lo es el nombramiento del funcionario que administra esta Rama de gobierno.

B

En aras de ser consistente con lo resuelto por este Tribunal en *Nieves Huertas*, controversia que involucraba a otro miembro de esta Curia, procede atender el recurso ante nuestra consideración, siguiendo los parámetros que allí trazamos. Por tanto, conviene examinar la legitimación activa del peticionario.

Como se sabe, la legitimación activa "es un elemento necesario para la debida adjudicación de los méritos de una controversia . . .". *Nieves Huertas*, 189 D.P.R. en la pág. 616; *Hernández Torres v. Gobernador*, 129 D.P.R. 824, 835 (1992). Esta doctrina de justiciabilidad requiere, en lo pertinente, que las partes tengan un interés real y concreto en la controversia que pende ante los foros

judiciales. Véase, por ejemplo, *E.L.A. v. Aguayo*, 80 D.P.R. 552, 584 (1958). En términos normativos, hemos determinado que la doctrina en cuestión exige que quienes insten una acción judicial cumplan con los siguientes requisitos:

> (1) [Q]ue ha[yan]sufrido un daño claro y palpable; (2) que el daño [sea]. . . real, inmediato y preciso y no uno abstracto o hipotético; (3) que la causa de acción . . . sur[ja] bajo el palio de la Constitución o de una ley, y (4) que exista una conexión entre el daño sufrido y la causa de acción ejercitada.
>
> *Noriega,* 135 D.P.R. en la pág. 427 (citando, entre otros, a *Hernández Torres v. Gobernador,* 129 D.P.R. 824, 836 (1992); *Fund. Arqueológica v. Dept. de la Vivienda*, 109 D.P.R. 387, 392 (1980)).

En consideración de lo anterior, es inevitable concluir que, en este caso, el peticionario no ha sufrido daño alguno, razón por la cual carece de legitimación activa. La mera pertenencia a la clase togada, así como el número de años que la Hon. Maite D. Oronoz Rodríguez pueda fungir como Jueza Presidenta, no suponen daños específicos, reales y concretos jurídicamente cognoscibles.

Así, es innegable que el peticionario carece de legitimación activa. Reitero, la demanda instada por el peticionario carece de la más elemental aseveración que permita traslucir, con algún grado de coherencia jurídica, el daño claro y palpable, real, inmediato y preciso que ha sufrido. El licenciado Torres Montalvo, pues, no nos informa en qué consiste el daño que alega sufrir. Asimismo, el expediente de este caso no refleja el más

mínimo intento de articular coherentemente la configuración de un daño jurídicamente apreciable. Que el peticionario sea abogado y tenga algún reparo con el número de años que la Jueza Presidenta pueda desempañar su cargo, bien pueden ser datos curiosos, pero éstos no tienen ninguna pertinencia al determinar si se configura un daño cognoscible que permita abrir las puertas de los tribunales a sus reclamos.

No obstante, la falta de legitimación activa del peticionario, conforme a lo resuelto por este Tribunal en *Nieves Huertas*, no es óbice para que abordemos los méritos, o falta de ellos, de los planteamientos de inconstitucionalidad de los nombramientos que esboza en su recurso.

## III

Por último, es menester reiterar que ante nuestra consideración de este Tribunal pende una controversia harto similar a la atendida por este Foro en *Nieves Huertas*, a saber: la legitimidad del nombramiento de un funcionario público, si bien por fundamentos distintos. Como se mencionó, en aquel momento, se impugnaron los nombramientos del Juez Asociado Rivera García y la Jueza Fernández Rodríguez, entre otros funcionarios. Así, dado el ingente interés público que este asunto implica, es preciso que atendamos, si bien someramente, los méritos de la controversia, tal y como se hizo en *Nieves Huertas*. Véase *Nieves Huertas*, 189 D.P.R. en la pág. 816 (atendiendo brevemente los méritos de la controversia planteada por los peticionarios, aun habiendo determinado

que éstos carecían de legitimación activa). Ello, como mecanismo para reforzar el análisis precedente, tanto en lo que respecta a la configuración de un daño a la luz de la doctrina de legitimación activa respecta, como para demostrar la patente frivolidad de los planteamientos esbozados por el peticionario.

Asimismo, no se debe perder de vista que, después de todo, el peticionario no sólo cuestiona la legitimidad de un nombramiento judicial, sino que pone en entredicho la legitimidad misma del poder que ejerce uno de los miembros de este Tribunal quien, a su vez, dirige la Rama Judicial.

A

Nuestra Constitución dispone, sin ambages, que "[e]l Tribunal Supremo será el tribunal de última instancia en Puerto Rico y se compondrá de **un juez presidente y cuatro jueces asociados**". Const. P.R. Art. V, Sec. 3. Por tanto, la referida disposición constitucional reconoce la existencia de *dos tipos* de jueces en la composición de este Tribunal. Cabe destacar que la diferencia tipológica de éstos responde, ante todo, a las atribuciones administrativas del Juez Presidente.

En cuanto a éstas, nótese, en primer lugar, que nuestra Constitución dispone que el Juez Presidente "dirigirá la administración de los tribunales y nombrará un director administrativo, quien desempeñará su cargo a discreción de dicho magistrado". Const. P.R. Art. V, sec. 7. Es decir, el Juez Presidente no sólo ejercerá las

prerrogativas judiciales inherentes a su cargo, en tanto juez, sino que, además, administrará la Rama Judicial, en tanto "sistema judicial unificado en lo concerniente a jurisdicción, funcionamiento y *administración*". *Id*. en la sec. 2 (énfasis suplido).

De otra parte, cabe destacar que la figura del Juez Presidente, además de las responsabilidades señaladas, "presidirá todo juicio de residencia del Gobernador". *Id*. en el Art. III, sec. 21. Asimismo, añádase a lo anterior que presidirá la Junta Revisadora de los Distritos Senatoriales y Representativos. Véase *id*. en la sec. 4.

Así, es innegable que la figura del Juez Presidente, en virtud de las responsabilidades que le confiere expresamente nuestra Constitución, supone un *tipo de juez* distinto al de sus pares, con atribuciones propias.

B

Por otro lado, la Sección 8 del Artículo V le reconoce al gobernador la facultad general, y sin cualificación alguna, de nombrar jueces, *todos los jueces de nuestro sistema judicial*. *Id.* en el Art. V, Sec. 8 ("Los jueces serán nombrados por el Gobernador con el consejo y consentimiento del Senado".). Esto es, el poder de nombramiento del gobernador se extiende a *todo tipo de juez*, indistintamente del tribunal en el que éste ejerza sus funciones judiciales.[19] No podría ser de otro modo,

---

[19] Es preciso señalar que, en lo que a este Tribunal respecta, las únicas limitaciones que condicionan la prerrogativa del gobernador de nombrar sus jueces son los requisitos para poder ser juez de este foro, según dispuestos en la Sección 9 del Artículo V. Const. P.R.

puesto que sólo de esta forma se logra el delicado balance entre las prerrogativas de la Rama Ejecutiva y las de la Rama Legislativa en lo atinente a la composición de la Rama Judicial. Nótese que la Rama Legislativa es quien tiene la encomienda de crear tribunales inferiores y, también, determinar la tipología de los jueces de éstos. Es decir, sus respectivas atribuciones en asuntos tales como la competencia y la jerarquía de éstos. Véase *Ley de la Judicatura del Estado Libre Asociado de Puerto Rico*, Ley Núm. 21 de 22 de agosto de 2003, 4 L.P.R.A. 24 *et seq*. De otra parte, la Legislatura también está facultada para crear tribunales inferiores. Véase *id*. Precisamente, como se dijo, además de crear este Tribunal, nuestra Constitución hace lo propio con el Juez Presidente, en la medida en que le confiere atribuciones propias que distan de las prerrogativas judiciales de sus pares.

Así, dado que la figura del Juez Presidente es un *tipo* de juez distinto, de hechura constitucional, con poderes y responsabilidades que exceden el ámbito de su función propiamente judicial, es innegable que el poder de nombramiento de ésta reside exclusivamente en el gobernador, puesto que a éste le compete nombrar *todos los tipos de jueces de la Rama Judicial*. Tan sencillo como esto.

---

Art. V, Sec. 9 ("Nadie será nombrado juez del Tribunal Supremo a menos que sea ciudadano de los Estados Unidos y Puerto Rico, haya sido admitido al ejercicio de la profesión de abogado en Puerto Rico por lo menos diez años antes del nombramiento y haya residido en Puerto Rico durante los cinco años inmediatamente anteriores al mismo".).

La Constitución, pues, no guarda ningún "silencio" en lo que a la elección del Juez Presidente respecta: las disposiciones constitucionales concernidas le confieren al Gobernador el poder exclusivo de nombramiento de jueces, con independencia del *tipo de juez del que se trate*, y a la Rama Legislativa la facultad de consentir éste, en los mismos términos, es decir, sin cualificación ulterior.[20]

De otra parte, en virtud de la regla 44.1(d) de Procedimiento Civil, 32 L.P.R.A. Ap. V, R. 44.1(d), los tribunales están facultados para imponerle a las partes el pago de honorarios de abogado cuando éstas hayan actuado temerariamente o esgrimido argumentos frívolos. Véase, por ejemplo, *P.R. Oil v. Dayco*, 164 D.P.R. 486, 511 (2005). Así, "[m]ediante la imposición de honorarios por temeridad se penaliza a un litigante que, obcecado por un afán desprovisto de fundamentos, obliga a otro a defenderse, lo que le causa molestias, gastos, trabajo e

---

[20] La comparación con las cámaras de la Rama Legislativa es improcedente. Baste con notar que éstas están facultadas para elegir sus propios presidentes en virtud de una *disposición constitucional expresa*. Véase Const. P.R. Art. III, Sec. 9 ("Cada cámara elegirá un presidente de entre sus miembros respectivos".). Es patentemente frívolo sostener que, dado que las cámaras legislativas tienen la facultad de nombrar a sus presidentes, este Tribunal está igualmente facultado para hacer lo propio. Ese pretendido silogismo es claramente deficiente, puesto que obvia el texto de la Constitución que, como dijimos, expresamente dispone que serán los propios miembros de los cuerpos legislativos quienes escogerán a sus respectivos presidentes. Asimismo, la Constitución es diáfanamente clara al disponer que la selección del Juez Presidente de este Tribunal, en tanto juez, es prerrogativa exclusiva del Gobernador, si bien con el consejo y consentimiento del Senado. Más que nada, la postura del peticionario se presenta como un mero artilugio.

inconvenientes". *Nieves Huertas*, 189 D.P.R. en la pág. 624 (citas omitidas). La imposición de esta sanción descansa en la sana discreción de los tribunales. *Jarra Corp. v. Axxis Corp.*, 155 D.P.R. 764, 779 (2001). En este caso, en vista de que los argumentos esgrimidos por el peticionario carecen de todo mérito, son intrascendentes, y dado que nos encontramos ante una situación análoga a aquélla que se suscitó en *Nieves Huertas*, estoy conforme con la imposición de honorarios de abogado. Véase *Nieves Huertas*, 189 D.P.R. en las págs. 624-625.

En consideración de lo anterior, la intervención de este Tribunal en el proceso político que se impugna supone una intromisión indebida en las prerrogativas, tanto de la Rama Ejecutiva, como de la Rama Legislativa. Esto es, la teoría esgrimida por el peticionario contraviene patentemente la doctrina de cuestión política, puesto que la selección de la figura del Juez Presidente, en tanto *juez de distinto tipo*, es un asunto que le fue expresamente delegado a las Ramas Ejecutiva y Legislativa. Véase, por ejemplo, *Noriega v. Hernández Colón*, 135 D.P.R. 406, 422-423 (1994); *Silva v. Hernández Agosto*, 118 D.P.R. 186, 217 (1962) (*Baker v. Carr*, 369 U.S. 186, 217 (1962)). Así lo determinó este Tribunal, en *Nogueras v. Hernández Colón (2)*, cuando señaló que

> [e]l mandato de la Constitución es diáfanamente claro: el nombramiento de los jueces es compartido por el Ejecutivo y la Legislatura, y el ejercicio de las funciones de cada uno de estos poderes no puede darse, en función de la doctrina constitucional reseñada, a merced del ejercicio de la función constitucional del otro.

Nogueras v. Hernández Colón, 127 D.P.R. 638, 652 (1991). Véase, también, Noriega, 135 D.P.R. en la pág. 422 ("[la doctrina de separación de poderes, en lo pertinente,] requiere que los tribunales no asuman jurisdicción sobre un asunto porque éste ha sido asignado textualmente por la Constitución a otra rama del Gobierno . . .".) (citas omitidas).

Para que no quepa la más mínima duda, es menester reiterar lo discutido de manera clara y categórica: **el nombramiento de la figura del Juez Presidente de este Tribunal es una prerrogativa exclusiva del Gobernador, en virtud de nuestro sistema tripartita de poderes.**[21]

---

[21] Valga señalar que en los estados de la nación norteamericana en donde se faculta al gobernador para nombrar al Juez Presidente "the constitution explicitly mentions the governor as the person granted the power to appoint the chief justice of the state's court of last resort." Luis Rivera Meléndez, *Chief Justice of Puerto Rico's Supreme Court: A Gubernatorial Appointment of a Court Election?*, 84 Rev. Jur. U.P.R. 1077, 1087 (2015). De otra parte, en seis (6) estados – California, Connecticut, Maine, Massachusetts, Nebraska y Rhode Island- la disposición constitucional en cuestión es análoga a la nuestra:

"[i]n six of these state constitutions [California, Connecticut, Maine, Massachusetts, Nebraska y Rhode Island] the power to appoint the chief justice is afforded to the governor in very broad and general terms. What this means is that these constitutions do not state explicitly that the governor will appoint the chief justice. They only provide the governor with a sweeping mandate that affords him power to appoint all judges of the supreme court, or even a broader mandate allowing him to appoint all judicial officers of the state." *Id.* en la pág. 1089.

Cabe señalar, además, que tanto la constitución de Maine como la constitución de Massachusetts fueron utilizadas como referencia para la redacción de la disposición constitucional que nos ocupa. Const. P.R. Art. V, Sec. 8. Véase *Diario de Sesiones de la Convención Constituyente*, Tomo IV, en la pág. 2611 (1961).

IV

En vista de lo anterior, estoy conforme con el proceder mayoritario. La presentación de recursos judiciales no debe servir como instrumento para adelantar causas políticas ni mucho menos cuestionar injustificadamente la legitimidad de los miembros de nuestra Judicatura. El discurso político de aspirantes a cargos públicos es sólo propio en la tribuna política, donde parece que todo cabe, mas no lo es, ni puede serlo, ante el estrado judicial. El peticionario se ha equivocado de foro.


                        Anabelle Rodríguez Rodríguez
                              Juez Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Hiram J. Torres Montalvo

     Peticionario

     v.

                   CT-2016-0003  Certificación Intrajurisdiccional

Hon. Alejandro García Padilla, Gobernador del Estado Libre Asociado de Puerto Rico

     Recurrido

Opinión de Conformidad emitida por el Juez Asociado señor MARTÍNEZ TORRES.

En San Juan, Puerto Rico, a 7 de marzo de 2016.

Estoy conforme con la expedición del recurso de certificación intrajurisdiccional y la desestimación de la demanda de epígrafe, por los fundamentos que se explican en la Opinión del Tribunal.

I.

El viernes, 12 de febrero de 2016, el Gobernador de Puerto Rico, Hon. Alejandro García Padilla, le presentó al Senado para su consejo y consentimiento la nominación de la entonces Jueza Asociada del Tribunal Supremo, Hon. Maite D. Oronoz Rodríguez, para ocupar el cargo de Jueza Presidenta de ese mismo foro. El 22 de febrero de 2016, el Senado descargó a la Comisión de Asuntos de lo Jurídico, Seguridad y

Veteranos de su obligación reglamentaria de evaluar la nominación de la Jueza Oronoz Rodríguez y presentar un informe al Cuerpo con su recomendación. De esa forma, la nominación de la Jueza pasó directamente a consideración del Pleno del Senado de Puerto Rico, por lo que no se celebraron vistas públicas y la Comisión no preparó un informe con sus hallazgos y recomendaciones.

Ese mismo día, el Lcdo. Hiram J. Torres Montalvo presentó en el Tribunal de Primera Instancia una demanda de interdicto, preliminar y permanente, y solicitud de sentencia declaratoria. Alegó que se debía emitir un interdicto para evitar que la Jueza Oronoz Rodríguez fuera confirmada como Jueza Presidenta "en contravención a la Constitución del Estado Libre Asociado de Puerto Rico y de las nociones básicas de una sana administración democrática que elimine las injusticias y el fraude". *Apéndice del recurso de certificación*, pág. 5. El licenciado Torres Montalvo arguyó que en vista de que la Constitución no dispone un mecanismo para la selección del Juez Presidente de este Foro, se debía recurrir al Art. 7 del Código Civil, 31 LPRA sec. 7, para determinar, conforme al principio de equidad, que le corresponde a los Jueces Asociados de este Tribunal seleccionar al Juez Presidente. Justificó su interés en la controversia al expresar que "es un abogado de profesión por lo que es una parte directamente afectada por la administración de los Tribunales". *Apéndice del recurso de certificación*, pág. 3.

Posteriormente, el 25 de febrero de 2016, el licenciado Torres Montalvo presentó ante nos un recurso de certificación intrajurisdiccional en el que nos solicitó que certificáramos el caso antes mencionado, dejáramos sin efecto el nombramiento de la Jueza Presidenta Oronoz Rodríguez y promulgáramos un reglamento interno para la selección del Juez Presidente, el cual incluyese un límite de años para ejercer ese cargo y cualquier otro mecanismo de remoción del Juez Presidente. Por su parte, el 29 de febrero de 2016, la Procuradora General, en representación del Gobernador y del Estado Libre Asociado, presentó una solicitud urgente de desestimación en la que argumentó que el peticionario carecía de legitimación activa, que la doctrina de cuestión política era aplicable a la controversia planteada y que la misma se había tornado académica. Además, manifestó que la demanda carecía de méritos, pues no existía ambigüedad o una laguna en nuestra Constitución respecto al nombramiento del Juez Presidente del Tribunal Supremo. Por todo lo anterior, nos invitó a desestimar de plano la demanda.

II.

A. Certificación intrajurisdiccional

La certificación intrajurisdiccional es un mecanismo procesal discrecional que permite elevar inmediatamente a la consideración de este Tribunal cualquier asunto pendiente ante el Tribunal de Primera Instancia o el Tribunal de Apelaciones cuando, entre otros escenarios, se plantean cuestiones de alto interés público que incluyen

cualquier asunto constitucional sustancial al amparo de la Constitución del Estado Libre Asociado de Puerto Rico o de Estados Unidos. 32 LPRA Ap. V R.52.2. En el pasado hemos dejado claro que este es "el mecanismo adecuado para atender asuntos que requieren urgente solución, ya sea porque se afecta la administración de la justicia o porque el asunto es de tal importancia que exige una pronta atención". UPR v. Laborde y otros, 180 DPR 253 272-273 (2010). Ahora bien, debido a su carácter excepcional, al momento de evaluar este tipo de recurso, debemos analizar rigurosamente los siguientes criterios: "(1) la urgencia, (2) la etapa en que se encuentran los procedimientos, (3) la necesidad que puede presentarse de recibir prueba y (4) la complejidad de la controversia". Rivera Schatz v. ELA y C. Abo. PR II, 191 DPR 791, 849 (2014).

Recientemente establecimos, aunque mediante una Sentencia, que los nombramientos de los funcionarios de la Rama Judicial están revestidos del más alto interés público, por lo que un cuestionamiento sobre su corrección o validez debe ser atendido con premura para evitar que se socave la confianza del Pueblo en nuestro sistema de justicia. Nieves Huertas et al. v. ELA I, 189 DPR 611, 613 (2013). Por esa razón, en aquella ocasión expedimos un recurso de certificación intrajurisdiccional y trajimos a nuestra atención inmediata una demanda en la que se aducía que los nombramientos de varios jueces, incluso el del compañero Juez Asociado señor Rivera García, eran nulos. Íd.

En el caso ante nuestra consideración, el peticionario aduce que el nombramiento de la Jueza Presidenta Oronoz Rodríguez debe ser invalidado por este Tribunal, pues, según alega, no se hizo conforme lo requiere nuestra Constitución. Al evaluar ese reclamo a la luz de los criterios antes expuestos, es forzoso concluir que nos encontramos ante un caso apropiado para ser elevado ante nuestra atención inmediata mediante el mecanismo de certificación. La naturaleza de la controversia planteada, así como las implicaciones que esta tiene para la estabilidad, el funcionamiento y la confianza del Pueblo en la Rama Judicial de Puerto Rico, hacen imprescindible que resolvamos el asunto con gran premura. Además, adviértase que tanto la parte peticionaria como la parte recurrida están de acuerdo con que atendamos la demanda de epígrafe en estos momentos. Por consiguiente, no hay duda de que ese proceder es lo más apropiado en este caso.

B. Legitimación activa

La legitimación activa de las partes que reclaman algún remedio ante los tribunales es un requisito de la doctrina de justiciabilidad. Esta requiere que las controversias que los tribunales resuelvan: (1) sean definidas y concretas, de tal forma que afecten las relaciones jurídicas entre las partes que tienen un interés antagónico; (2) que el interés sea real y sustancial de manera que se pueda conceder un remedio específico mediante una sentencia de carácter concluyente y, (3) que la controversia sea propia para una

determinación judicial. Asoc. Fotoperiodistas v. Rivera Schatz, 180 DPR 920, 932 (2011). Así, las controversias justiciables se distinguen de disputas hipotéticas o abstractas, así como casos académicos o ficticios. Íd.

Hemos resuelto que para que una parte posea legitimación activa, es necesario que cumpla con los siguientes requisitos: (1) que ha sufrido un daño claro y palpable; (2) que ese daño es real, inmediato y preciso, no abstracto o hipotético; (3) que existe conexión entre el daño sufrido y la causa de acción ejercitada, y (4) que la causa de acción surge bajo el palio de la Constitución o una ley. Fundación Surfrider y otros v. ARPE, 178 DPR 563 (2010).

En Nieves Huertas et al. v. ELA I, supra, varios demandantes alegaron tener legitimación activa para cuestionar la validez de ciertos nombramientos judiciales por el mero hecho de ser abogados, puesto que la supuesta nulidad de los nombramientos afectaría a sus representados, así como el ordenamiento legal y el interés público. En ese entonces dejamos claro, mediante una Sentencia que hoy resulta sumamente persuasiva, que ese interés genérico no era suficiente para incoar un pleito a esos fines. De esa forma, expresamos que resolver lo contrario hubiese "implicado que cualquier persona pu[diese] impugnar o hacer cualquier reclamación ante la violación de cualquier ley sin [tener] […] la necesidad de exponer el daño específico que tal actuación le provoca[se]". Íd., pág. 617.

En el caso que hoy nos ocupa, al igual que en <u>Nieves Huertas et al. v. ELA I</u>, <u>supra</u>, el peticionario aduce genéricamente que tiene legitimación activa debido a que es abogado y el nombramiento de la Jueza Presidenta Oronoz Rodríguez incide sobre la administración de los tribunales, lo que le afecta. Como se expresa en la Opinión de este Tribunal, entiendo que ese supuesto daño no es suficiente para concederle legitimación activa. Este no ha explicado en qué consiste el daño particular, real, palpable e inmediato que el nombramiento de la Jueza Presidenta le ha causado. Por el contrario, su escueta alegación sobre este particular lo que demuestra es que nos encontramos ante un "daño" abstracto e hipotético. Por lo tanto, en vista de que el peticionario carece de legitimación activa, estoy conforme con la desestimación de la demanda de epígrafe.

C. Honorarios de abogado

La Regla 44.1 de Procedimiento Civil, 32 LPRA Ap. V, R.44.1 dispone que cuando cualquier parte o su abogado haya procedido con temeridad o frivolidad, el tribunal estará obligado a imponerle el pago de una suma por concepto de honorarios de abogado. El objetivo de "la imposición de honorarios de abogado en casos de temeridad es establecer una penalidad a un litigante perdidoso que por su terquedad, obstinación, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente, a asumir las molestias, gastos, trabajo e inconveniencias de un pleito". (citas omitidas)

Andamios de PR v. JPH Contractors, Corp., 179 DPR 503 (2010).

En este caso, el peticionario, al igual que los demandantes en Nieves Huertas et al. v. ELA I, supra, no ha presentado ningún fundamento jurídico que sustente sus alegaciones. Por el contrario, sus reclamos se hacen en el vacío y carecen de cualquier mérito. Esto ha tenido como consecuencia directa que la parte recurrida, el Estado Libre Asociado, haya tenido que incurrir innecesariamente en gastos para defenderse. Por lo tanto, estoy conforme con la imposición de honorarios de abogado como sanción al peticionario. Determinar lo contrario sería inconsistente con la esencia básica de la justicia, que nos exige tratar de igual manera a quienes se encuentran en situaciones análogas. De esa forma evitamos la arbitrariedad en el uso del poder. Así, apartarnos del curso de acción que seguimos en Nieves Huertas et al. v. ELA I, supra, ante un escenario análogo al de autos nos obligaría a explicar si fuimos muy severos con la sanción en aquel entonces o si estamos siendo muy lenientes con el peticionario en este caso. Mi voto es por la consistencia en el uso del poder. De esa forma protegemos la legitimidad del Tribunal y la confianza del Pueblo en sus instituciones.

III.

Antes de concluir, me veo compelido a hacer unas expresiones adicionales debido al reciente ataque a la integridad y dignidad de este Tribunal, y de los Jueces y Juezas que lo componen.

En medio de la evaluación de la nominación de la Jueza Oronoz Rodríguez, el Senado de Puerto Rico, en el descargo de sus prerrogativas, determinó ofrecer su consejo y consentimiento de forma expedita, y sin la tradicional participación de la ciudadanía en vistas públicas. El Presidente de ese Cuerpo, Hon. Eduardo Bhatia Gautier, justificó el trámite acelerado al alegar que desde este Tribunal "pretendían usurpar el derecho del gobernador a nombrar al juez presidente". Karixia Ortiz Serrano, Reacción de juez eclipsa juramentación de Oronoz, Metro, miércoles, 24 de febrero de 2016, pág. 2. El senador Bhatia Gautier expresó que contaba con "información fidedigna de que esa posibilidad era real, y esa posibilidad era una agenda de algunos senadores del Partido Nuevo Progresista y de alguna gente que estaban confabulándose con algunos abogados y aparentemente había unos oídos bastante receptivos de algunas personas que ocupan hoy la posición de jueces del Supremo". Bhatia justifica confirmación expreso de Oronoz, Noticel, 23 de febrero de 2016. Según el senador, tenía conocimiento de que "había una disposición, disponibilidad de alguna de las personas que hay en el Tribunal Supremo, que […] quieren abrogarse el poder de nominar y nombrar al juez presidente fuera de lo que dicen las leyes tradicionales de Puerto Rico". Íd.

Resulta sorprendente y lamentable que el Presidente del Senado llevara a ese cuerpo a actuar de forma atropellada a base de un mero rumor de pasillo que llegó a

sus oídos. Ese proceder solo tuvo como efecto desacreditar injustamente a la Jueza Presidenta Oronoz Rodríguez y le impidió poder presentar al Pueblo de Puerto Rico sus planes desde la presidencia de esta Rama de Gobierno, así como poder atender cualquier duda relacionada con su capacidad para asumir los deberes del cargo. Por un rumor de pasillo se mancilló la imagen de la Jueza Presidenta. Por un rumor infundado también se privó al Pueblo de Puerto Rico de expresarse respecto a tan importante nombramiento. Eso no tan solo es contrario a la costumbre en el Senado al evaluar a las personas nominadas a ocupar un cargo en este Foro, sino que tampoco es consecuente con las consignas que profesan los dirigentes de ese Cuerpo que exhortan enérgicamente al Pueblo a hablar y a hacerse sentir. Pero no es a mí a quien le corresponde pasar juicio sobre esa actuación del Presidente del Senado, la cual, sin lugar a dudas, estaba dentro de sus prerrogativas. Eso lo juzgará el Pueblo de Puerto Rico en su día.

Ahora bien, lo que sí puedo, y más bien, estoy obligado a hacer, es defender la integridad y dignidad de este Tribunal. Bajo ningún concepto puedo permanecer callado cuando se mancilla al Tribunal Supremo, usándolo como una ficha política. Lo que dio pie al trámite tan precipitado de confirmación de la Jueza Presidenta fue una mera conjetura que, para colmo, raya en la frivolidad y carece de todo mérito. Como se menciona en la Opinión del Tribunal, eso se sabía desde marzo de 2014, cuando el Juez

Presidente señor Hernández Denton hizo público el sentir de todos los integrantes de este Tribunal:

> Luego de dialogar con mis compañeros jueces asociados y juezas asociadas sobre este asunto, puedo afirmar que **todos estamos de acuerdo** en que es al gobernador de Puerto Rico a quien corresponde cubrir esa vacante con el consejo y consentimiento del Senado. De la misma manera que hemos defendido las prerrogativas constitucionales de la Rama Judicial, somos deferentes y respetamos las prerrogativas constitucionales de las otras ramas de gobierno. (Énfasis suplido.) Romero Barceló insta a jueces a escoger al presidente del Supremo, El Nuevo Día, 4 de marzo de 2014, http://www.elnuevodia.com/noticias/politica/nota/romerobarceloinstaajuecesaescogeralpresidentedelsupremo-q735943/ (última visita, 7 de marzo de 2016).

El texto de la Constitución de Puerto Rico crea dos puestos distintos en este Tribunal, a saber, el de Juez Presidente y el de Juez Asociado. Art. V, Sec.3, Const. ELA, LPRA Tomo 1. No existe tal cosa como un cargo genérico de "juez del Tribunal Supremo". Acto seguido, la Constitución dispone expresamente que le corresponde al Gobernador nombrar a todos "los jueces", con el consejo y consentimiento del Senador. Art V, Sec. 8, Const. ELA LPRA Tomo 1. Tanto el Juez Presidente, como los Jueces Asociados son "jueces", por lo que no cabe duda que en nuestro ordenamiento constitucional, la nominación de ambos es prerrogativa del Gobernador. Ese ha sido el entendido desde el primer nombramiento del Juez Presidente luego de que se aprobara la Constitución en 1952, cuando el Gobernador Luis Muñoz Marín envió al Senado el

nombramiento del entonces Juez Asociado Aaron Cecil Snyder para sustituir al Juez Presidente Roberto H. Todd Borrás en ese cargo.

Adviértase que la Constitución de Puerto Rico, a diferencia de la de otras jurisdicciones de Estados Unidos, no dispone que todos los jueces, salvo el Juez Presidente, serán nombrados por el Gobernador. Por lo tanto, dado que la Constitución no establece una excepción para el nombramiento del Juez Presidente, este recae, al igual que el resto de los nombramientos judiciales, en manos del Gobernador de Puerto Rico. Para una discusión en detalle sobre este particular, véase Luis Rivera Méndez, Chief Justice of Puerto Rico's Supreme Court: A Gubernatorial Appointment or a Court Election, 84 Rev. Jur. UPR 1077 (2015).

Me da pena que el senador Bhatia Gautier, quien es abogado de profesión, le diera alguna credibilidad a esa conjetura sinsentido. Estaba desmentida desde 2014. Pero más decepcionante resulta que la utilizara como base para desarrollar una teoría de conspiración imaginaria, en la que este Tribunal asumía un rol antagónico frente al Gobernador y a la Asamblea Legislativa. Esa maniobra, digna de una teleserie estilo House of Cards, tuvo como consecuencia directa insertar a este Tribunal en medio de un debate político partidista al cual no pertenece, y lacerar así la dignidad y confianza del Pueblo en esta Rama.

Debe quedar claro que la Constitución establece que los nombramientos a este Tribunal recaen en las ramas políticas y, por lo tanto, las personas nombradas a este Foro reflejan una filosofía judicial consistente con la de los funcionarios que el Pueblo eligió para llevar a cabo esos nombramientos. Así lo expresé junto a la hermana Jueza Asociada señora Pabón Charneco en <u>Martínez Román y otros v. E.L.A.</u>, 177 DPR 569 (2009) (Decisión referente a una moción de inhibición.) La facultad del Gobernador para nombrar todos los jueces, incluyendo a la Jueza Presidenta, responde a esa facultad. Como señaló el delegado Víctor Gutiérrez Franqui el 3 de diciembre de 1951 en la Convención Constituyente, quitarle al Gobernador la facultad de nombrar los jueces para traspasarla a un "consejo judicial", como proponía la minoría en la convención,

> …sería divorciar la selección de los jueces del proceso político de un pueblo, para entregarlos a la selección de una clase, que es la clase profesional, que tiene que postular ante esos mismos jueces.

> Yo les digo, señorita Presidenta y compañeros delegados, que en el curso del tiempo dedicado al estudio de estas proposiciones me tropecé con, por lo menos, cinco o seis formas distintas de integrar este consejo judicial, y en todas ellas encontré siempre el mismo defecto. O sea, en un gobierno democrático es malo que el Senado de Puerto Rico, electo por el pueblo, sea el que decida quién va a ser una persona aceptable para ser juez. Es malo que el Gobernador de Puerto Rico, electo por el pueblo, haga la designación inicial correspondiendo al mandato del pueblo. Pero es muy bueno que nueve abogados, que nunca han tenido ningún respaldo

público, ni del pueblo, sean los que en cónclave se reúnan, y obliguen al Gobernador y al Senado en la selección de los jueces. Yo no puedo concebir que ése sea el sistema ideal en una democracia…. 1 _Diario de Sesiones de la Convención Constituyente_ 483 (ed. 1961).

Esta institución no es un balón para que los políticos de turno lo arrojen a su antojo en aras de ganar adeptos o adelantar sus agendas en la arena político partidista. El ejercicio responsable del poder en un sistema democrático exige de los dirigentes de cada una de las tres Ramas de Gobierno "prudencia, respeto y deferencia" hacia las demás. _PIP v. CEE_, 120 DPR 580, 611 (1988). Lo contrario simplemente no es propio de los hombres y mujeres de Estado y no es lo que el Pueblo espera de sus gobernantes. Sin lugar a dudas, la actuación del Presidente del Senado durante ese proceso dista mucho de esos postulados. Pero no se le puede pedir peras al olmo. Después de todo, esta no es la primera vez que el Presidente del Senado antagoniza, desacredita y le falta el respeto a la Rama Judicial en aras de adelantar su agenda política. Véase _Alvarado Pacheco y otros v. ELA_, 188 DPR 594, 608-610 (2013) (Resolución).

Lo mismo aplica al licenciado Torres Montalvo y a los políticos que han cuestionado la legalidad del nombramiento de la Jueza Presidenta. Tampoco puedo guardar silencio cuando se cuestiona la legitimidad del cargo que ostenta una integrante de este Tribunal, con el objetivo de adelantar candidaturas en primarias y cuando se hace creer al Pueblo que este Foro es un comité partidista

sujeto al patronazgo político. No puedo quedarme callado cuando se trata de socavar la confianza del Pueblo en sus instituciones por pura gula partidista. Eso es un pecado capital contra la democracia. La frivolidad de la demanda debió ser evidente para el licenciado Bhatia Gautier y, de igual modo, para el licenciado Torres Montalvo. Por eso, coincido con la imposición de honorarios de abogado al peticionario.

IV.

Por todo lo anterior, estoy conforme con la desestimación de la demanda de epígrafe y la imposición de honorarios de abogado al peticionario.


Rafael L. Martínez Torres
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Hiram J. Torres Montalvo

    Peticionario

       v.                   CT-2016-003    Certificación

                                                Intrajurisdiccional

Hon. Alejandro García Padilla,
Gobernador del Estado Libre
Asociado de Puerto Rico

    Recurrido

Opinión de conformidad emitida por el Juez Asociado SEÑOR ESTRELLA MARTÍNEZ

San Juan, Puerto Rico, a 7 de marzo de 2016.

Por estar convencido de que la nominación y confirmación de **todas** las personas que ocupamos la silla de juez o jueza en nuestro sistema de justicia es producto de la prerrogativa exclusiva de las Ramas Ejecutiva y Legislativa –como consecuentemente lo he expresado en varios foros- estoy conforme con la determinación de este Tribunal. Por ello, descarto la propuesta del peticionario de que usurpemos mediante reglamentación –como una especie de "pivazo" judicial- las facultades de nombramiento y confirmación correspondientes a las aludidas Ramas y convirtamos el proceso en uno

eleccionario entre los miembros del Pleno. De esta forma, respetamos los límites claros que imparte nuestra Constitución.

## I

El caso de epígrafe encuentra su génesis el 22 de febrero de 2016, cuando el Lcdo. Hiram J. Torres Montalvo (licenciado Torres Montalvo o peticionario) presentó ante el Tribunal de Primera Instancia una *Demanda de injunction preliminar y permanente y solicitud de sentencia declaratoria*, contra el Estado Libre Asociado de Puerto Rico (ELA) y el Hon. Alejandro García Padilla, en su capacidad oficial. En esencia, solicitó un interdicto preliminar para impedirle al ELA el nombramiento y confirmación de la Hon. Maite D. Oronoz Rodríguez como Jueza Presidenta de este Tribunal. A su vez, alegó que procedía decretar la ausencia de fundamento constitucional para delegar en el Gobernador de Puerto Rico la facultad de nombrar al Juez Presidente o Jueza Presidenta de este Tribunal. En cuanto a ello, argumentó que esa autoridad debía recaer en los miembros de este Tribunal.

En atención a lo anterior, el 23 de febrero de 2016, el foro primario emitió una orden mediante la cual, entre otras cosas, le concedió 5 días a la parte demandada para que expusiera su posición en torno a la

demanda incoada por el licenciado Torres Montalvo. Previo al vencimiento del plazo concedido, el 25 de febrero de 2016, el licenciado Torres Montalvo acudió ante este Tribunal mediante *Recurso de certificación intrajurisdiccional*.

En su comparecencia, el peticionario plantea que el nombramiento del Juez Presidente o Jueza Presidenta de este Tribunal por parte del Gobernador no encuentra apoyo jurídico en la Constitución ni en nuestros pronunciamientos jurisprudenciales. En ese sentido, aduce que ese método de nombramiento vulnera nociones básicas de democracia y de sana administración de la justicia. Amparado en lo anterior, el licenciado Torres Montalvo solicita que dejemos sin efecto el nombramiento de la Hon. Maite D. Oronoz Rodríguez como Jueza Presidenta de este Tribunal. De igual forma, suplica que este Tribunal promulgue un "Reglamento Interno" para la selección del Juez Presidente o Jueza Presidenta, el cual incluya un límite de años para ejercer el cargo y mecanismos para su remoción.

Por su parte, el 29 de febrero de 2016, el ELA, por conducto de la Oficina de la Procuradora General, compareció ante nos mediante *Urgente solicitud de desestimación*. En ésta, sostiene que el licenciado Torres Montalvo carece de legitimación activa para

promover un pleito en el cual solo invoca un "interés generalizado" en el funcionamiento de los tribunales. Del mismo modo, argumenta que la petición de interdicto instada por el peticionario advino académica, por razón de que el 22 de febrero de 2016 el Senado confirmó a la Hon. Maite D. Oronoz Rodríguez como Jueza Presidenta de este Tribunal y posteriormente prestó juramento al cargo que ocupa. Además, la Oficina de la Procuradora General alega que la demanda presentada es patentemente inmeritoria y frívola, ya que no existe ninguna ambigüedad en nuestra Constitución en torno a que el nombramiento del Juez Presidente o Jueza Presidenta de este Tribunal le corresponde al Primer Ejecutivo, sujeto al consejo y consentimiento del Senado.

Examinado el caso, este Tribunal decidió certificar y disponer prontamente de la controversia. Mediante el dictamen que hoy emite, se resuelve que ésta no es justiciable, ya que el licenciado Torres Montalvo carece de legitimación activa para promover el pleito de epígrafe. Aun desde el prisma más liberal de la concesión de acceso a la justicia, estoy conforme con el dictamen de este Tribunal en cuanto a que el peticionario no cumple con los criterios esenciales de la llamada legitimación activa.

Ahora bien, dado el incuestionable interés público apremiante que reviste este caso y la persistencia del debate jurídico en torno al tema, estimo oportuno expresarme con relación a la controversia medular que éste presenta; esto es: la manera en que debe seleccionarse la persona que ocupará la presidencia de este Tribunal. *Véanse* Nieves Huertas *et al*. v. ELA I, 189 DPR 611 (2013) (Sentencia); Acevedo Vilá v. Meléndez, 164 DPR 875 (2005). Este asunto primordial nunca había estado ante nuestra consideración mediante un caso-controversia y, ciertamente, requiere la más pronta atención. Ello, en aras de otorgarle **certeza** a un aspecto fundamental del funcionamiento del Poder Judicial, sin postergar aún más la resolución de esta controversia. Veamos.

## II

Sabido es que el método de selección de jueces mediante el nombramiento del Primer Ejecutivo y posterior confirmación del Senado, rige en nuestra jurisdicción desde hace más de un siglo.[22] Las

---

[22]Adviértase que al amparo de las disposiciones de la *Ley Foraker de 1900*, el Presidente de los Estados Unidos nombraba al Juez Presidente y a los Jueces Asociados de este Tribunal, con el consejo y consentimiento del Senado federal. *Véase* Carta Orgánica de 1900, Sec. 33, LPRA, Tomo 1, ed. 2008, pág. 45. Del mismo modo, nótese que bajo la *Ley Jones de 1917* se mantuvo el poder del Presidente de los Estados Unidos de nombrar al Juez Presidente y a los Jueces Asociados de

discusiones suscitadas en la Convención Constituyente, plasmadas en el *Informe de la Comisión de la Rama Judicial*, constituyen evidencia irrefutable de la intención de los constituyentes de **mantener** en nuestra jurisdicción el sistema de selección de jueces por nominación del Gobernador. Surge de aquellos históricos debates que, luego de considerar cuidadosamente otras formas de selección de jueces, la Comisión de la Rama Judicial recomendó **retener** en nuestra Constitución "la forma de **selección tradicional** en el sistema judicial de Puerto Rico". IV <u>Diario de Sesiones de la Convención Constituyente de Puerto Rico</u>, *Informe de la Comisión de la Rama Judicial*, ed. 2003, pág. 2610. (Énfasis suplido). De esta forma, tras concluir que el sistema tradicional de selección de jueces por nombramiento del Gobernador era el más adecuado, la Comisión **no encontró motivo alguno para que se alterara o derogara esa tradición**. IV <u>Diario de Sesiones de la Convención Constituyente de Puerto Rico</u>, *Informe de la Comisión de la Rama Judicial*, ed. 2003, págs. 2610-2611.

_____

este Tribunal, sujeto a la aprobación del Senado federal. *Véase* Carta Orgánica de 1917, Sec. 40, LPRA, Tomo 1, ed. 2008, pág. 125. Asimismo, tras la promulgación de la Ley Orgánica de la Judicatura de 1950, Ley Núm. 432 de 15 de mayo de 1950, se retuvo el método de selección de jueces mediante el nombramiento del Gobernador, sujeto al consejo y consentimiento del Senado. (1950 Leyes de Puerto Rico 1127-1149).

Cabe resaltar que los constituyentes descartaron una enmienda que proponía adoptar un método de nombramiento de jueces de este Tribunal mediante la participación de un Consejo Judicial, compuesto por nueve miembros,[23] que sometería una terna de tres candidatos a la consideración del Gobernador. I Diario de Sesiones de la Convención Constituyente de Puerto Rico, ed. 2003, págs. 479-480. Los constituyentes rechazaron este método bajo el fundamento de que no era deseable permitir que un grupo de nueve letrados, jueces y antiguos jueces controlaran el nombramiento de jueces de este Tribunal. I Diario de Sesiones de la Convención Constituyente de Puerto Rico, ed. 2003, pág. 483. Argumentando en contra de establecer el propuesto Consejo Judicial, el delegado Gutiérrez Franqui expresó que **"sería divorciar la selección de los jueces del proceso político de un pueblo**, para entregarlos a la selección de una clase, que es la clase profesional, que tiene que postular ante esos mismos jueces". I Diario de Sesiones de la Convención Constituyente de Puerto Rico, ed. 2003, pág. 483. (Énfasis suplido).

---

[23]Este Consejo Judicial estaría compuesto por el Juez Presidente del Tribunal Supremo, el Juez jubilado del Tribunal Supremo de mayor antigüedad, el Presidente del Colegio de Abogados, el Juez de Distrito de mayor antigüedad, el Decano del Colegio de Derecho de la Universidad de Puerto Rico y cuatro abogados practicantes. I Diario de Sesiones de la Convención Constituyente de Puerto Rico, ed. 2003, págs. 479-480.

Por último, es menester señalar que los constituyentes no vislumbraron que el cardinal principio de independencia judicial requiriera modificar la tradicional facultad del Gobernador y el Senado de nombrar y confirmar, respectivamente, los jueces de nuestro sistema judicial. Al debatir sobre el tema, los constituyentes identificaron varios aspectos que garantizaban la necesaria independencia judicial y que permitían que no se modificara el sistema tradicional de nombramiento de jueces, a saber: (1) el sistema integrado de los tribunales; (2) el término de nombramiento de los jueces; (3) la facultad de este Tribunal de adoptar reglas de procedimiento civil, criminal y de evidencia; (4) el poder de la Rama Judicial con relación a la administración de los tribunales; (5) la compensación de los jueces fijada por ley; (6) el mecanismo de separación de los jueces de sus puestos; (7) las limitaciones de participación de los jueces en campañas políticas; y (8) la composición de este Tribunal y los mecanismos para variarla. I *Diario de Sesiones de la Convención Constituyente de Puerto Rico*, ed. 2003, págs. 452-455. Indudablemente, para los constituyentes el sistema tradicional de nominación de jueces preserva la independencia necesaria que debe existir en nuestro sistema republicano de gobierno.

Como se puede apreciar, el método de nombramiento de jueces por parte del Gobernador en nuestra jurisdicción no es un asunto meramente de tradición, sino que tiene su génesis en una ponderada determinación de nuestros constituyentes de mantener la forma de selección tradicional en el sistema judicial de Puerto Rico.

**A.**

Evidentemente, la decisión de los constituyentes con respecto al sistema de nombramiento de jueces quedó consumada al aprobarse el texto final de la Constitución de Puerto Rico en el 1952. Elaboremos.

Como es conocido, entre sus disposiciones, la Constitución le otorga vida jurídica al Poder Judicial, y por ende, a este Tribunal. Precisamente, en su Art. V, Sec. 3, nuestra Carta Magna establece que este Tribunal será el de última instancia y "se compondrá de un juez presidente y cuatro jueces asociados". Art. V, Sec. 3, Const. ELA, LPRA, Tomo 1, ed. 2008, pág. 412. Es decir, dentro de las personas que ocupan cargos en este Tribunal, existe un puesto de Juez Presidente o Jueza Presidenta y varios puestos de jueces y juezas asociadas. La cantidad de jueces que revela la Constitución puede ser modificada mediante estatuto, a petición del propio Tribunal. Íd.

Resulta oportuno indicar que la Constitución no solo instaura la figura del Juez Presidente o Jueza Presidenta de este Tribunal, sino que la distingue del cargo de Juez Asociado o Jueza Asociada, toda vez que delimita las funciones primordiales que ejercerá. A tales efectos, dispone que "[e]l Juez Presidente dirigirá la administración de los tribunales y nombrará un director administrativo, quien desempeñará su cargo a discreción de dicho magistrado".[24] Art. V, Sec. 7, Const. ELA, LPRA, Tomo 1, ed. 2008, pág. 416. Ello significa que por mandato constitucional el cargo de Juez Presidente o Jueza Presidenta no se circunscribe a presidir y dirigir los asuntos internos de este Tribunal, sino que tiene la encomienda de administrar el Poder Judicial.

Tal y como se acordó por parte de nuestros constituyentes, la Constitución le confiere al Gobernador de Puerto Rico la facultad de nombrar los jueces que compondrán nuestro sistema judicial. Ello es así en virtud del Art. V, Sec. 8, de la Constitución en donde expresamente se dispone que "**[l]os jueces serán**

---

[24] La Constitución de Puerto Rico también advierte que el Juez Presidente o Jueza Presidenta "presidirá todo juicio de residencia del Gobernador". Art. III, Sec. 21, Const. ELA, LPRA, Tomo 1, ed. 2008, pág. 401. A su vez, por mandato constitucional tiene la encomienda de presidir la Junta Revisadora de los Distritos Senatoriales y Representativos. Art. III, Sec. 4, Const. ELA, LPRA, Tomo 1, ed. 2008, pág. 383.

**nombrados por el Gobernador** con el consejo y consentimiento del Senado". Art. V, Sec. 8, Const. ELA, LPRA, Tomo 1, ed. 2008, pág. 417. (Énfasis suplido). Similar cláusula emana del Art. II, Sec. 2, de la Constitución de los Estados Unidos en donde se establece claramente la facultad del Presidente para nominar a los jueces del Tribunal Supremo, con el consejo y consentimiento del Senado. Art. II, Sec. 2, Const. EE. UU., LPRA, Tomo 1, ed. 2008, pág. 173. Además, análoga cláusula obra en las constituciones de los estados de Maine, New Jersey, New Hampshire, Massachusetts y Delaware, las cuales sirvieron de precedentes para confeccionar la norma que establece nuestra Carta Magna, según consta expresamente en el Informe de la Comisión de la Rama Judicial. IV <u>Diario de Sesiones de la Convención Constituyente de Puerto Rico</u>, *Informe de la Comisión de la Rama Judicial*, ed. 2003, pág. 2611; *véase*, además, L. Rivera Méndez, *Chief Justice of Puerto Rico's Supreme Court: A Gubernatorial Appointment or a Court Election?*, 84 Rev. Jur. UPR 1077 (2015).

Adviértase que la citada disposición constitucional hace referencia a **todos** los jueces de nuestro sistema judicial, por igual. Es decir, el texto de la Constitución **no hace distinciones ni mucho menos clasifica por categorías o por responsabilidades** los jueces que el Gobernador nombrará. Por tanto, es forzoso

concluir que la alusión a "jueces" empleada en el Art. V, Sec. 8, de la Constitución incluye todo cargo de juez y, evidentemente, se extiende al puesto de Juez Presidente o Jueza Presidenta.

Con relación al caso particular de los miembros de este Tribunal, la Constitución indica que éstos "no tomarán posesión de sus cargos hasta que sus nombramientos sean confirmados por el Senado y los desempeñarán mientras observen buena conducta". Art. V, Sec. 8, Const. ELA, LPRA, Tomo 1, ed. 2008, pág. 417. Precisa subrayar que la Constitución solo restringe la autoridad del Gobernador para nombrar a los jueces de este Tribunal en virtud de lo dispuesto en su Art. V, Sec. 9. De allí surge con meridiana claridad que nadie podrá ser nombrado juez de este Tribunal a menos que sea ciudadano de los Estados Unidos y de Puerto Rico, haya sido admitido al ejercicio de la abogacía en Puerto Rico por lo menos diez años antes del nombramiento y haya residido en Puerto Rico durante los cinco años inmediatamente anteriores al mismo. Art. V, Sec. 9, Const. ELA, LPRA, Tomo 1, ed. 2008, pág. 417.

**III**

En fin, tras examinar detenidamente el texto de la Constitución, así como el historial de la Convención Constituyente, *reafirmo* que no existe posibilidad para

elucubrar otras posibles interpretaciones. Que quede claro: la facultad constitucional para nombrar **todos y cada uno de los jueces y juezas** que componen nuestro sistema judicial -incluida la persona que presidirá este Tribunal- reside exclusivamente en el Primer Ejecutivo, sujeto, claro está, al posterior consentimiento por parte del Senado. Nieves Huertas *et al.* v. ELA I, *supra*, pág. 620; Nogueras v. Hernández Colón, 127 DPR 638, 650 (1991) (*Per Curiam*); Hernández Agosto v. López Nieves, 114 DPR 601, 620 (1983). Habida cuenta de que el puesto de Juez Presidente o Jueza Presidenta es un cargo de "juez", su nombramiento le corresponde al Gobernador, al amparo del claro mandato estatuido en el Art. V, Sec. 8, de nuestra Constitución. Ese es nuestro esquema constitucional.

Por tanto, opino que no existe ambigüedad o laguna en nuestro ordenamiento constitucional en torno a la manera en que debe seleccionarse la persona que habrá de presidir este Tribunal. Como vimos, la historia constitucional de este Pueblo revela dónde radica ese poder. Ese fue el método que decidieron mantener los constituyentes y el que finalmente se aprobó en la Constitución. No se vislumbró otro método alterno al establecido.

Cualquier enmienda a nuestro esquema constitucional en esa esfera, debe ser efectuada mediante el curso político y legislativo correspondiente. En ninguna jurisdicción estatal de los Estados Unidos en la que el Pleno del Tribunal escoge a su Presidente el proceso ha sido provocado por un reclamo unilateral del cuerpo colegiado. Por el contrario, ese ejercicio de selección por parte del Pleno está contenido en sus respectivos ordenamientos constitucionales o estatutarios, con un lenguaje que expresamente lo contempla. *Véase* L. Rivera Méndez, *Chief Justice of Puerto Rico's Supreme Court: A Gubernatorial Appointment or a Court Election?*, 84 Rev. Jur. UPR 1077 (2015).

En consecuencia, considero que no hay espacio en nuestro ordenamiento constitucional para concluir que el poder de nominar al Juez Presidente o Jueza Presidenta de este Tribunal recae en otra autoridad que no sea el Gobernador de Puerto Rico. Una interpretación en esa dirección constituiría una lectura trunca del Art. V, Sec. 8, de nuestra Constitución, conllevaría resultados absurdos y atentaría contra la división tripartita de poderes característica de nuestro sistema de gobierno. Tanto el texto de la Constitución, como el historial de su adopción, derrotan de su faz cualquier otra posible interpretación.

**IV**

Al amparo de los fundamentos enunciados, estoy conforme con la determinación que hoy toma este Tribunal.


                                    Luis F. Estrella Martínez
                                         Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Hiram J. Torres Montalvo<br><br>Peticionario<br><br>v.<br><br>Hon. Alejandro García Padilla, Gobernador del Estado Libre Asociado de Puerto Rico<br><br>Recurridos | CT-2016-0003 | Certificación Intrajurisdicciona |

Opinión de conformidad en parte y disidente en cuanto a la Parte V, emitida por el Juez Asociado señor Kolthoff Caraballo

En San Juan, Puerto Rico, a 7 de marzo de 2016.

La verdad está en los ojos que la miran y la Justicia en el corazón que la piensa. Como señala el Juez Benjamín N. Cardozo, "[p]odemos intentar ver las cosas tan objetivamente como queramos. No obstante, nunca las veremos con otros ojos excepto los nuestros".[25]

Una cosa es lo que una persona desea, otra cosa es lo que debe ser y otra lo que es. Y en el mundo del Derecho, como en la vida misma, estas tres realidades en ocasiones no se encuentran. La ley es lo que es, y no siempre lo que necesariamente alguien quisiera que fuera. Aún más, la ley, e incluso la Constitución, no siempre representan lo que pudiera estimarse justo o correcto.

---

[25] B.N. Cardozo, The Nature of the Judicial Process, New Haven, Yale Univ. Press, 1921, pág. 3.

Más bien, simplemente reflejan lo que es la voluntad democrática del Pueblo o sus representantes en un momento determinado.

El concepto de lo que es correcto o de la justicia yace en la mente de cada ser humano y puede responder a múltiples factores. Como es de esperarse entonces, lo que es justo o correcto puede variar de ser humano en ser humano, convergiendo en algo bastante amorfo. El Derecho debe intentar dar la forma o el acomodo razonable necesario para reconciliar, **en lo que sea posible**, lo que es justo o correcto con lo que es la ley tal cual ha sido legislada. Así, a los juristas, sobre todo los que pautamos norma jurídica, nos corresponde tratar de discernir o construir con el mayor de los esfuerzos tal reconciliación, en armonía con lo que los parámetros constitucionales, los principios hermenéuticos y la propia ley que se interpreta nos lo permitan. **Tamaña empresa y a menudo incomprensible labor que no puede sucumbir ante rigores personales, dogmatismos o los cánticos de sirena del populismo.** Sólo así podremos caminar con la frente en alto y con la tranquilidad de que hemos cumplido con nuestro deber, como se afirma al momento que se jura al cargo, con la ayuda del Creador.

**No me queda duda de que la respuesta correcta con relación a la controversia de a quién le corresponde nombrar al Juez Presidente o Jueza Presidenta de este Tribunal – asunto que en el Pueblo ha producido un intenso e**

**interesante debate- es que tal nominación corresponde al Primer Ejecutivo y su confirmación al Senado de Puerto Rico.** Así lo establece nuestra Constitución. Si existen mejores métodos y si los mismos debieran escrutarse en vía a un cambio es un asunto que claramente no le corresponde determinar a esta Curia. Ese poder pertenece al Pueblo a través del mecanismo remedial que se reservó para sí en nuestra Constitución.

I

El Lcdo. Hiram Torres Montalvo (peticionario) presentó ante este Tribunal un recurso de certificación con el propósito de que eleváramos ante nuestra consideración una *Demanda de injunction preliminar y permanente y solicitud de sentencia declaratoria* presentada ante el Tribunal de Primera Instancia para que se deje sin efecto el nombramiento de la Jueza Presidenta. A tales fines, aduce que es a este Tribunal Supremo, y no al Gobernador, a quien le correspondía nombrar a la persona que ocupará el puesto de Juez Presidente del Tribunal Supremo. Ello, fundado en que en nuestra Constitución no existe una disposición específica para el nombramiento de tal cargo. Por su parte, el Estado presentó una *Urgente solicitud de desestimación* en la que señala que procede la desestimación de la demanda presentada por el peticionario debido a que éste no tiene legitimación activa para impugnar el nombramiento de la Jueza Presidenta.

## II

### A

Conforme al Art. I, Sec. 2 de nuestra Constitución, el gobierno de Puerto Rico tendrá forma republicana y estará compuesto por tres poderes, los que estarán igualmente subordinados a la soberanía del Pueblo y encomendados a tres ramas distintas y separadas: Rama Legislativa, Rama Ejecutiva y Rama Judicial.[26] Los dos criterios fundamentales que sustentan la doctrina de separación de poderes son: (1) proteger la libertad de los ciudadanos y (2) salvaguardar la independencia de cada rama del gobierno, evitando así que una rama domine a otra o interfiera con ésta.[27] Claro está, la división entre esos tres poderes no significa que haya independencia absoluta entre éstos, sino que, por el contrario, nuestra Constitución busca crear un sistema de pesos y contrapesos con el fin de generar un equilibrio dinámico entre poderes de igual rango, y así evitar que alguno amplíe su autoridad a expensas del otro.[28]

En cumplimiento con lo anterior, nuestro ordenamiento jurídico "requiere que las tres ramas reconozcan y respeten los ámbitos constitucionales de cada una. Así pues, la deferencia judicial que le concedemos a la Rama Legislativa y a la Rama Ejecutiva tiene como corolario necesario que

---

[26] Art. I, Sec. 2, Const. ELA, LPRA, Tomo 1.

[27] Colón Cortés v. Pesquera, 150 DPR 724, 750 (2000).

[28] Misión Ind. P.R. v. J.P., 146 DPR 64, 89 (1998).

ellas también tengan la misma deferencia hacia los poderes conferidos por nuestra Constitución a la Rama Judicial, para así evitar que se menoscabe el sistema republicano de gobierno".[29]

En nuestra historia como Tribunal, los casos Santa Aponte v. Ferré Aguayo, 105 DPR 670 (1977), y Santa Aponte v. Srio. del Senado, 105 DPR 750 (1977), son fundamentales en el tema sobre el poder de la revisión judicial. En el primero, expresamos -mediante Resolución- que "la autoridad para interpretar la Constitución y las leyes del país reside exclusivamente en la Rama Judicial. **La Rama Judicial puede resolver que determinada facultad le corresponde tan solo a otra Rama, pero la interpretación al efecto es atributo exclusivo de los tribunales**".[30] (Énfasis suplido). En el segundo, esta Curia fue enfática al establecer que "[l]a función de ser intérprete final de la Constitución le corresponde exclusivamente a un solo poder, al Poder Judicial. La Constitución les confiere determinadas facultades al Poder Legislativo y al Ejecutivo, pero **la definición de sus contornos y la determinación de la validez de su ejercicio son asuntos cuidadosamente reservados a los tribunales**".[31] (Énfasis suplido). Asimismo, citando

---

[29] Acevedo Vilá v. Meléndez, 164 DPR 855, 884 (2005).

[30] Santa Aponte v. Ferré Aguayo, 105 DPR 670, 671 (1977).

[31] Santa Aponte v. Srio. del Senado, 105 DPR 750, 759 (1977).

jurisprudencia federal sobre el tema, este Tribunal emitió

la siguiente expresión:

> La determinación de si alguna materia ha sido
> confiada por la Constitución en cualquier medida
> a otra rama del gobierno o si los actos de dicha
> rama exceden la autoridad cedida **representa de
> por sí un delicado ejercicio de interpretación
> constitucional y en tal carácter es
> responsabilidad de esta Corte como intérprete
> final de la Constitución**. (Énfasis suplido).[32]

Estrechamente relacionado con el asunto sobre el poder

de la revisión judicial, hallamos la doctrina de

justiciabilidad.[33] Ésta se refiere al conjunto de doctrinas

que surgen del requisito "caso o controversia" dispuesto

expresamente en el Art. III, Sec. 2 de la Constitución de

Estados Unidos.[34] El principio de justiciabilidad sirve como

una norma de autolimitación del ejercicio del poder judicial

que responde -en gran medida- al papel asignado a la

Judicatura en la distribución tripartita de poderes,

específicamente diseñada para asegurar que ésta no

intervendrá en áreas sometidas al criterio de las otras

ramas de gobierno.[35] En virtud de esta doctrina

---

[32] Íd., pág. 760, citando a Baker v. Carr, 369 US 186, 211 (1962).

[33] Es importante aclarar que, distinto a la Constitución de Estados Unidos, la Constitución de Puerto Rico no tiene una disposición expresa sobre el requisito de "caso o controversia". Más bien, ello se incorporó jurisprudencialmente a nuestro ordenamiento jurídico en ELA v. Aguayo, 80 DPR 552 (1958). Véase R. Elfren Bernier y J. A. Cuevas Segarra, Aprobación e Interpretación de las Leyes en Puerto Rico, 2da ed., San Juan, Ed. Publicaciones JTS, Inc., 1987, pág. 147.

[34] Art. III, Sec. 2, Const. EE.UU., LPRA, Tomo 1.

[35] Fund. Surfrider y otros v. A.R.Pe., 178 DPR 563, 571 (2010). Véase, además, Noriega v. Hernández Colón, 135 DPR 406, 420 (1995).

autoimpuesta, "los tribunales se preguntan y evalúan si es o no apropiado entender en determinado caso tomando en cuenta diversos factores y circunstancias mediante un análisis que les permite ejercer su discreción en cuanto al límite de su poder constitucional".[36]  Los siguientes elementos son corolarios de la doctrina de justiciabilidad: opinión consultiva (*advisory opinion*), pleito colusorio, legitimación (*standing*), academicidad (*mootness*), madurez (*ripeness*) y cuestión política.[37]

En consideración a que el punto focal que activa al Poder Judicial es la presencia de una controversia justiciable, hemos expresado que en ausencia de ésta "la intrusión del tribunal constituirá una transgresión de los poderes de otra rama de gobierno".[38]  En síntesis, "[e]l pleito debe ser justiciable, no puede constituir una opinión consultiva, debe estar maduro, el demandante debe de tener capacidad para demandar, y el pleito no debe ser académico".[39]

Como mencionamos, una de las doctrinas de autolimitación es la legitimación activa (*standing*).  Con ésta requerimos que todo aquel que quiera ser parte en una

---

[36] Com. de la Mujer v. Srio. de Justicia, 109 DPR 715, 720 (1980).

[37] Véase J.J. Álvarez González, Derecho Constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos, Bogotá, Ed. Temis SA, 2009, pág. 89.

[38] R. Elfren Bernier y J. A. Cuevas Segarra, Aprobación e Interpretación de las Leyes en Puerto Rico, 2da ed., San Juan, Ed. Publicaciones JTS, Inc., 1987, pág. 148.

[39] Íd., pág. 149.

reclamación judicial "ha de tener una capacidad individualizada y concreta 'en la reclamación' procesal".[40] De esta forma nos aseguramos de que el promovente de la acción tiene un interés de tal índole que, con toda probabilidad, proseguirá con su causa de acción de manera vigorosa y traerá a la atención del tribunal las cuestiones en controversia.[41]

En ausencia de una disposición estatutaria que confiera expresamente legitimación activa a ciertas personas, se requiere que la parte que solicita un remedio judicial pruebe lo siguiente: (1) que ha sufrido un daño claro y palpable; (2) el daño es real, inmediato y preciso, no abstracto o hipotético; (3) existe una relación causal razonable entre la acción que se ejecuta y el daño alegado, y (4) la causa de acción surge al amparo de la Constitución o de alguna ley.[42]

En la situación que atendemos, el peticionario argumenta que tiene legitimación activa para solicitar que interpretemos si es el Gobernador o el Pleno de este Tribunal el que tiene la facultad para nombrar al Juez Presidente o Jueza Presidenta de este Foro meramente por ser abogado en nuestra jurisdicción. Vagamente arguye que se ve

---

[40] Col. Ópticos de P.R. v. Vani Visual Center, 124 DPR 559, 563 (1989).

[41] Hernández Torres v. Gobernador, 129 DPR 824, 835 (1992). Véase, también, Hernández Agosto v. Romero Barceló, 112 DPR 407, 413 (1982).

[42] Véase Hernández Torres v. Gobernador, supra, págs. 835-836.

afectado con el nombramiento de la Jueza Presidenta por parte del Gobernador, pues es en ella en quien recae la administración de la Rama Judicial, en la cual litiga. No le asiste la razón. El daño requerido para que una parte ostente legitimación activa tiene que ser real, inmediato y preciso, no abstracto o hipotético como el que expone el peticionario.

De ordinario, esta determinación sería suficiente para disponer del caso, o sea, desestimar la demanda presentada. Ello por razón de que si el peticionario no tiene acción legitimada, prudencialmente nos abstendríamos, como regla general, de entender en los méritos del mismo. Ahora bien, y con el propósito de que no quede duda sobre la validez de los actos del Gobernador y del Senado en una controversia de alto interés público como la de autos, aun aceptando -a los fines de la argumentación- que el peticionario tuviera acción legitimada para instar el recurso de certificación, intimo que el resultado sería el mismo.[43]  Veamos.

**B**

Los Padres de la Constitución confirieron el poder nominador de los Jueces de esta Curia, incluido el del Juez

---

[43] Véase <u>Acevedo Vilá v. Melendez</u>, 164 DPR 875 (2005).

Presidente, al Gobernador, con el consejo y consentimiento del Senado de Puerto Rico. Este asunto queda claramente atendido en el texto expreso del Art. V, Sección 8 de nuestra Constitución, en el que se establece lo relativo al nombramiento de los jueces de la Rama Judicial. Éste dispone lo siguiente:

> **Los jueces serán nombrados por el Gobernador con el consejo y consentimiento del Senado**. Los jueces del Tribunal Supremo no tomarán posesión de sus cargos hasta que sus nombramientos sean confirmados por el Senado y los desempeñarán mientras observen buena conducta. (Énfasis suplido).[44]

En cuanto al Tribunal Supremo de Puerto Rico, la propia Constitución establece, en su Art. V Sec. 3, que "[e]l Tribunal Supremo será el tribunal de última instancia en Puerto Rico y **se compondrá de un juez presidente y cuatro jueces asociados**. El número de sus jueces sólo podrá ser variado por ley, a solicitud del propio Tribunal Supremo". (Énfasis suplido).[45] En virtud de su facultad para variar el número de jueces, la Legislatura aprobó la Ley Núm. 169-2010 "a los fines de aumentar el número de jueces asociados del Tribunal Supremo a ocho (8) para que junto con el Juez Presidente sean nueve (9) jueces los que compongan el máximo foro". Ahora, el Art. 3.001 de la Ley de la Judicatura de 2003, según enmendada, 4 LPRA sec. 24r, dispone que "[e]l Tribunal Supremo será el tribunal de última instancia en

---

[44] Art. V, Sec. 8, Const. ELA, LPRA, Tomo 1.

[45] Art. V, Sec. 3, Const. ELA, LPRA, Tomo 1.

Puerto Rico y se compondrá de un Juez Presidente y de ocho (8) Jueces Asociados". En esta ley se mantuvo diferenciada la figura del Juez Presidente de los puestos de Jueces Asociados.

Como se puede apreciar, de la lectura de las disposiciones legales aplicables se desprende que el Gobernador de Puerto Rico es quien tiene la facultad constitucional de nombrar a los jueces en Puerto Rico. No tan solo la facultad de nominar los juristas que ocuparán los cargos de Jueces Asociados de este Tribunal Supremo, sino también el de Juez Presidente o Jueza Presidenta, así como el de todos los jueces que componen nuestra Judicatura. Así, los arquitectos de la Constitución diseñaron un proceso de nombramiento de jueces para el Poder Judicial en el cual el Poder Ejecutivo es el que está facultado para nominar la persona que ocupará el cargo de Juez Presidente, siempre y cuando el Poder Legislativo, por conducto del Senado de Puerto Rico, confirme su nombramiento.

A la luz de nuestra Constitución no hay espacio para adoptar la pretensión del peticionario de que sea el Pleno de este Tribunal Supremo el que tenga la potestad de nombrar quién será su Juez Presidente o Jueza Presidenta. Me explico.

Primeramente, el Art. IV, Sec. 4 de nuestra Constitución establece que "**el Gobernador del Estado Libre**

**Asociado podrá […] nombrar, en la forma que se disponga por esta Constitución o por ley, a todos los funcionarios para cuyo nombramiento este facultado […]"**. (Énfasis suplido).[46] De esta forma, en nuestra Constitución se consignó expresamente que "[l]os jueces serán nombrados por el Gobernador con el consejo y consentimiento del Senado".[47] Entre las disposiciones pertinentes a los jueces de la Rama Judicial se constituye la composición de los jueces de este Tribunal Supremo de la siguiente forma: "[e]l Tribunal Supremo […] se compondrá de un juez presidente y cuatro jueces asociados".[48]

Por ello, el planteamiento del peticionario en cuanto a que el Art. V, Sec. 8 de nuestra Constitución (sobre el poder del Gobernador de nombrar a los jueces) no incluye el cargo de Juez Presidente no tiene cabida lógica en Derecho. Esto pues, ante la ausencia de exclusión, debemos entender que cuando los Padres de la Constitución expresaron "jueces" se referían precisamente a todos los jueces, tanto a los Jueces Asociados como al Juez Presidente o Jueza Presidenta, sin distinción.

---

[46] Art. IV, Sec. 4, Const. ELA, LPRA, Tomo 1.

[47] Art. V, Sec. 8, Const. ELA, LPRA, Tomo 1.

[48] Art. V, Sec. 3, Const. ELA, LPRA, Tomo 1.

Además, si al Gobernador no le corresponde hacer la nominación del Juez Presidente o Jueza Presidenta porque tal facultad no se encuentra expresamente en la Constitución, o sea, porque nuestra Carta Magna guarda silencio al respecto, tendríamos que concluir, basado en ese mismo razonamiento, que tampoco podría nombrar a los Jueces Asociados porque ese poder **tampoco aparece expresamente** en la Constitución. Esto es, si la expresión "los jueces serán nombrados por el gobernador" no incluye al Juez Presidente o Jueza Presidenta, entonces ¿por qué sí incluye a los Jueces Asociados?

Ciertamente, de ninguno de los puestos —el de Juez Presidente así como el de los Jueces Asociados— se hace mención expresa en la Constitución con relación a quién corresponde nombrarlos. Por eso, al evaluar cada expresión en su contexto, llego a la irremediable conclusión de que cuando el Art. V, Sec. 8 de nuestra Constitución menciona a "los jueces" incluye a todos los jueces, incluyendo necesariamente a los Jueces Asociados y al Juez Presidente o Jueza Presidenta.

Ahora bien, si aceptáramos —para fines de la argumentación— que en efecto la Constitución no dispone expresamente quién ha de tener la facultad de nominar al Juez Presidente o Jueza Presidenta, las reglas de

hermenéutica nos establecerían un camino mucho más complejo que simplemente autoconferirnos tal facultad. Me explico.

Sabido es que la hermenéutica legal se refiere al ejercicio de interpretar las leyes, lo que conlleva auscultar, averiguar, precisar y determinar cuál ha sido la voluntad legislativa, o sea, lo que el Legislador ha querido exponer.[49] Una vez se conoce el deseo y la voluntad del Legislador se entiende que se ha logrado el objetivo de interpretar la ley y, por lo tanto, no procede aplicar alguna regla de hermenéutica. Como parte del proceso de conocer la voluntad legislativa, corresponde examinar las manifestaciones del Legislador durante el proceso legislativo, el cual -por lo general- comienza con un proyecto de ley que se remite a la comisión pertinente para que lo estudie y emita un informe con recomendaciones.[50] En este análisis sobre la voluntad o el deseo del Legislador constituye un elemento de suma importancia el que se pueda examinar el Diario de Sesiones, puesto que ahí se recoge el debate en el hemiciclo.[51]

Constituye un principio cardinal de hermenéutica que al lenguaje de una ley corresponde darle la interpretación que valide el propósito que tuvo el Legislador al aprobar la

---

[49] Elfren Bernier y Cuevas Segarra, op. cit., pág. 241.

[50] Elfren Bernier y Cuevas Segarra, op. cit., pág. 242.

[51] Íd.

misma.[52]   Por tanto, hemos establecido que este Foro debe armonizar -hasta donde sea posible- todas las disposiciones de ley involucradas, ello con miras a lograr un resultado sensato, lógico y razonable que represente la intención del Legislador.[53]   En el ejercicio de la interpretación estatutaria, es fundamental tener presente cuál fue la intención del Legislador  para así dar efecto a ese propósito e intención.[54]   Por ello, la ley debe interpretarse tomando en consideración los fines que persigue y en forma tal que se ajuste al fundamento racional o fin esencial de la ley, y a la política pública que la inspira.[55]

Al remitirnos a la transcripción de los debates de la Asamblea Constituyente para la aprobación de la Constitución y al *Informe de la Comisión de la Rama Judicial* observamos que los constituyentes, tras ponderar varios mecanismos para la selección de jueces de la Rama Judicial, escogieron deliberadamente el método de selección tradicional de todos los jueces de la Rama Judicial mediante el nombramiento del Gobernador con el consejo y consentimiento del Senado.[56]   En

---

[52] Rivera Maldonado v. Autoridad sobre Hogares, 87 DPR 453, 456 (1963).

[53] Andino v. Fajardo Sugar Co., 82 DPR 85, 94 (1961).

[54] Elfren Bernier y Cuevas Segarra, op. cit., pág. 267.

[55] Esso Standard Oil v. A.P.P.R., 95 DPR 772, 785 (1968).

[56] Diario de Sesiones de la Convención Constituyente de Puerto Rico, T. 4, págs. 472-518.

el *Informe de la Comisión de la Rama Judicial*, la Comisión

consignó lo siguiente:

> **La comisión recomienda que se retenga en esta constitución la forma de selección tradicional en el sistema judicial de Puerto Rico.** La comisión consideró cuidadosamente otras formas de selección de jueces, a saber, la elección directa de los mismos, el sistema auspiciado por la *American Bar Association* adoptado en Misuri y diversas proposiciones sobre sistemas de nombramiento mediante la intervención de un consejo judicial. Prevalece el criterio entre las autoridades que han tratado este tema, de que la selección directa de los jueces por elección popular es un sistema que lejos de garantizar su independencia los somete a influencias políticas indeseables. La experiencia demuestra que el sistema de elección popular ha tenido como resultado la selección de jueces menos idóneos. El sistema auspiciado por la American Bar Association es propulsado en aquellas jurisdicciones donde no existe el nombramiento por el [jefe] ejecutivo como paso de transición del sistema indeseable de elección hacia el sistema de nombramiento por el [jefe] ejecutivo a que se aspira. **Aceptándose generalmente, que el sistema de selección por nombramiento es el más adecuado, la Comisión no ve razón alguna para que se altere la tradición puertorriqueña a este respecto.** (Énfasis suplido).[57]

Al iniciar la discusión sobre el nombramiento de

jueces, el Presidente de la Convención dio lectura a la

siguiente sección: **"Los jueces** serán nombrados por el

Gobernador, con el consejo y consentimiento del Senado, y

los del Tribunal Supremo no entrarán en el ejercicio de sus

cargos sin haber sido confirmados sus nombramientos por el

Senado". (Énfasis suplido).[58] En su turno, el delegado Sr.

---

[57] Informe de la Comisión de la Rama Judicial, Diario de Sesiones de la Convención Constituyente, T. 4, págs. 2610-2611.

[58] Diario de Sesiones de la Convención Constituyente de Puerto Rico, T. 1, pág. 472.

Lino Padrón Rivera propuso una enmienda para que la sección pertinente fuese enmendada de la siguiente manera: "**Los jueces del Tribunal Supremo** serán electos por los electores capacitados de Puerto Rico por un término de doce años en una elección especial". (Énfasis suplido).[59] Debido a que el delegado Padrón Rivera había votado en la Comisión a favor de que la elección de los jueces se realizara mediante el nombramiento del Gobernador, este emitió la siguiente expresión para justificar su propuesta:

> Yo quiero aclarar […] que voté en la comisión porque el Gobernador nombrara los jueces del Supremo, aclarando que votaba así porque [ya se] derrotaba la proposición de la delegación socialista, que mantiene la elección del pueblo; y **comparando entonces el sistema de nombramiento de Gobernador con el consejo y consentimiento del Senado, con el sistema de un consejo judicial, yo estaba con el sistema de nombramientos por el Gobernador porque entendía que era más democrático el nombramiento por el Gobernador sujeto a la confirmación del Senado, porque era un mandato indirecto del pueblo;** entendía yo que era mejor y voté por eso, condicionando el voto, a defender aquí nuestra teoría de que los jueces fueran electos por el pueblo. (Énfasis suplido).[60]

Las expresiones del delegado Padrón Rivera también se encuentran comprendidas en el Apéndice del Diario de Sesiones intitulado "Elección de **Jueces del Supremo** Ampliación de Manifestaciones del Hon. Lino Padrón Rivera".[61]   En réplica, el delegado Sr. Ernesto Ramos

---

[59] Íd., pág. 490.

[60] Íd., pág. 491.

[61] Íd., págs. 802-807.

Antonini expresó lo siguiente: "La experiencia vivida por el pueblo de Puerto Rico con su tradición, la de que la selección de los jueces mediante el nombramiento [por] el Gobernador de Puerto Rico con la confirmación del Senado ha desarrollado una judicatura en Puerto Rico, que bien puede servir de orgullo al pueblo de Puerto Rico ante cualquiera de los estados de la Unión Americana".[62] Luego de que los Constituyentes analizaran la discusión sobre la enmienda propuesta por el delegado Padrón Rivera, se votó "no ha lugar" a la enmienda.[63]

Como se desprende, los Constituyentes decidieron mantener sin enmiendas la sección sobre la selección de jueces con el propósito de que todos los jueces, incluyendo al Juez Presidente o Jueza Presidenta del Tribunal Supremo y los Jueces Asociados, fuesen elegidos por el Gobernador, con el consejo y consentimiento del Senado. Valga destacar que aun cuando se discutieron varios mecanismos para nombrar jueces, los Constituyentes en ningún momento mencionaron algún interés en delegar a los Jueces de este Tribunal Supremo la facultad de escoger al Juez Presidente o Jueza Presidenta.[64]

---

[62] Diario de Sesiones de la Convención Constituyente de Puerto Rico, T. 1, pág. 497.

[63] Íd., pág. 511.

[64] Íd., pág. 472 y ss.

Antes de la aprobación de nuestra Constitución, la Ley Foraker regulaba expresamente el nombramiento del Juez Presidente del Tribunal Supremo y esta establecía que:

> El poder judicial residirá en las Cortes y Tribunales de Puerto Rico […] **Disponiéndose […] que el Presidente y Jueces Asociados del Tribunal Supremo y el Márshal (Alguacil Mayor) del mismo, serán nombrados por el Presidente, con el concurso y consentimiento del Senado;** y los Jueces de las Cortes de Distrito serán nombrados por el Gobernador, con el concurso y consentimiento del Consejo Ejecutivo, y todos los demás empleados y agregados de las demás Cortes serán escogidos o elegidos según disponga la Asamblea Legislativa. (Énfasis suplido).[65]

Aprobada con posterioridad, la Ley Jones disponía lo siguiente:

> El poder judicial residirá en las cortes y tribunales de Puerto Rico ya establecidos y en ejercicio de acuerdo y por virtud de las leyes vigentes. La jurisdicción de dichos tribunales y los trámites seguidos en ellos, así como los distintos funcionarios y empleados de los mismos, continuarán como al presente hasta que otra cosa se disponga por ley; Disponiéndose […] que **el Presidente y los Jueces Asociados del Tribunal Supremo serán nombrados por el Presidente, con el concurso y consentimiento del Senado de los Estados Unidos** […] (Énfasis suplido).[66]

Como se desprende, la Ley Foraker y la Ley Jones disponían que el Presidente de Estados Unidos era quien elegía al Juez Presidente y a los Jueces Asociados del Tribunal Supremo. A pesar de que en nuestra Constitución no se consignó expresamente la facultad de la Rama Ejecutiva para escoger a los Jueces de este Tribunal Supremo, del examen de las disposiciones legales aplicables se colige que

---

[65] Art. 33 de la Ley Foraker, LPRA, Tomo 1, ed. 2008, págs. 44-45.

[66] Art. 40 de la Ley Jones, LPRA, Tomo 1, ed. 2008, pág. 125.

los Constituyentes englobaron en el Art. V, Sec. 8 de nuestra Constitución, la facultad del Gobernador para nombrar a todos los jueces, haciendo innecesario crear una disposición específica para regular el nombramiento de los Jueces de este Foro.

**C**

Por otro lado, el peticionario argumenta que ante el supuesto vacío constitucional sobre la facultad del Gobernador para nombrar al Juez Presidente o Jueza Presidenta de este Tribunal, el asunto debería ser atendido internamente por este Foro mediante la aprobación de un reglamento a los fines de que, como en la Asamblea Legislativa y en algunas constituciones de otras jurisdicciones, los miembros de este cuerpo seamos quienes seleccionemos a uno de nuestros pares para que presida esta Curia. De manera que el peticionario nos invita a aplicar hermenéuticamente el reconocido principio de analogía en favor y como fundamento para su causa.

En primer lugar, y como ya hemos señalado, conforme al estado de Derecho actual, nuestra Constitución no faculta ni expresa ni implícitamente a los miembros de este Foro a seleccionar quién nos dirija. Esto, contrario a los cuerpos legislativos que, como acierta el peticionario, sí están expresamente facultados para ello, y a las otras jurisdicciones en las que se concede explícitamente tal

facultad al Tribunal Supremo. En cuanto a nuestra jurisdicción, el Art. III, Sec. 9 de nuestra Constitución expresamente señala que "[c]ada cámara elegirá un presidente de entre sus miembros respectivos".[67]

Como podemos concluir, de los tres cuerpos colegiados mencionados en nuestra Constitución, a solo dos -el Senado y la Cámara de Representantes- les fue otorgado expresamente el poder de que su Presidente fuera elegido por sus pares. ¿Qué razón lógica pudiera existir para que los Padres de nuestra Constitución no hubieran hecho lo mismo con el Tribunal Supremo, si esa hubiera sido su intención? Es evidente que, habiéndolo considerado y ejecutado con relación a las cámaras legislativas, constituye una inferencia necesaria que los Constituyentes no quisieron hacer lo mismo con esta Curia.

Sobre la invocación del principio de analogía por parte del peticionario, debemos destacar que en nuestro ordenamiento jurídico se recurre al principio de analogía únicamente cuando el Derecho no ha contemplado el supuesto específico que se ha de resolver, pero existe otro semejante al planteado que ha sido previsto y entre ambos existe identidad de razón.[68] En estas situaciones hemos resuelto

---

[67] Art. III, Sec. 9, Const. ELA, LPRA, Tomo 1.

[68] Orraca López v. ELA, 192 DPR 31, 45 (2014), citando a J. Puig Brutau, Compendio de Derecho Civil, Ed. Bosch, 1987, Vol. I, pág. 105. Véase Art. 7 del Código Civil, 31 LPRA sec. 7.

que "la norma del caso regulado podrá aplicarse por analogía al caso que no lo está porque la misma razón justifica la identidad de la consecuencia".[69] Ahora bien, advertimos que la analogía como función integradora del juez no se impone de modo automático, sino que precisa un proceso de decisión judicial.[70] Este ejercicio exige circunspección, pues no se deberá acoger una norma por analogía cuando dicha adopción tenga el efecto de frustrar la intención que emana de la ley o la política pública que la inspira.[71] De igual manera, tampoco podrá aplicarse la analogía cuando su utilización haya sido expresamente prohibida por ley.[72]

En resumen, los criterios a examinar si procede aplicar el principio de analogía son los siguientes: existencia de una laguna legal sobre una cuestión que debe resolverse; identidad de razón entre esta y otra situación que fue contemplada; que no exista prohibición legislativa de recurrir a la analogía; y que su aplicación no tenga el efecto de frustrar la intención que emana de la ley o la política pública que la inspira.

---

[69] Orraca López v. ELA, supra, pág. 45.

[70] Orraca López v. ELA, supra, pág. 45; Legislación Civil Vigente, Código Civil, Ed. Lex Nova, 2004, Vol. II, pág. 46.

[71] Íd.

[72] Por ejemplo, el Art. 2 de nuestro Código Penal, 33 LPRA sec. 5002, dispone que "[n]o se podrán crear ni imponer por analogía delitos, penas ni medidas de seguridad".

Debido a que el principio de analogía tiene como elemento esencial la existencia de una laguna legal y, en atención a que, como he señalado, en nuestra Constitución en realidad no existe un vacío sobre quién tiene la facultad de nombrar al Juez Presidente o Jueza Presidenta del Tribunal Supremo, estamos impedidos de acudir al principio de analogía. Aun así, para fines puramente argumentativos, si entendiéramos que existe un vacío en ley, tendríamos que resolver que no procede aplicar por analogía el mecanismo de selección de un presidente de las cámaras legislativas dispuesto en nuestra Constitución ni las disposiciones constitucionales de otras jurisdicciones en las que se faculta a la Corte Suprema la elección de su Juez Presidente o Jueza Presidenta. Ello, fundado en que tales situaciones no satisfacen los requisitos para la aplicación del principio de analogía.

Primeramente, no existe identidad de razón entre las disposiciones de la Asamblea Legislativa y la Rama Judicial, pues ambas tienen funciones y características muy distintas. El método de elección de los Legisladores es por el voto directo de la ciudadanía, y su término se limita a 4 años.[73] Por otra parte, la selección de los miembros de esta Curia se da mediante la nominación por parte del Poder Ejecutivo con la confirmación del Senado. Nuestro término es hasta la

---

[73] Art. VI, Sec. 4, Const. ELA, LPRA, Tomo 1.

edad de 70 años.[74]  Además, en lo relativo a la composición de los cuerpos legislativos, la Constitución atiende dicho asunto de manera muy distinta al Tribunal Supremo. Así pues, establece la composición de los cuerpos legislativos de la siguiente manera:

> El Senado se compondrá de **veintisiete Senadores** y la Cámara de Representantes de **cincuenta y un Representantes,** excepto cuando dicha composición resultare aumentada a virtud de lo que se dispone en la Sección 7 de este Artículo. (Énfasis suplido).[75]

Como podemos observar, nuestra Carta Magna no hace distinción sobre los miembros que componen cada cuerpo legislativo y su presidente.  Es decir, el Senado se compone de 27 senadores, no de 26 senadores y un senador presidente. Lo mismo ocurre en su homóloga Cámara de Representantes.  En contraste, en el caso de este Tribunal Supremo, la Constitución no deja espacio a discusión, pues esta dispone claramente que el Tribunal Supremo estará compuesto por "**un Juez Presidente y cuatro Jueces Asociados**". **Por ello, el cargo de Juez Presidente o Jueza Presidenta es un cargo separado y único a nivel constitucional que desde el momento de su nombramiento queda distinguido del de los Jueces Asociados.**

Como segundo argumento para la aplicación del principio de analogía, el peticionario expone que en diversas

---

[74] Art. V, Sec. 10, Const. ELA, LPRA, Tomo 1.

[75] Art. III, Sec. 2, Const. ELA, LPRA, Tomo 1.

jurisdicciones de Estados Unidos se atiende el asunto de la selección del Juez Presidente o Jueza Presidenta mediante el voto mayoritario de los miembros de la corte suprema de la jurisdicción, por lo que solicita que adoptemos dicho mecanismo de selección. Reconozco que existen múltiples jurisdicciones en Estados Unidos en las cuales la figura del Juez Presidente o Jueza Presidenta de su Corte Suprema es elegida entre sus pares por decisión de la mayoría de estos. Sin embargo, debo mencionar que todas y cada una de estas jurisdicciones tienen estatutos que expresamente facultan a los miembros de la corte suprema a tomar dicho curso de acción.[76] En Puerto Rico esa no es la realidad y no nos corresponde a nosotros como miembros de esta Curia conferirnos esas prerrogativas que no nos fueron concedidas por el Pueblo.

En un breve análisis sobre varias jurisdicciones de Estados Unidos, me llama la atención el proceso del estado de Kentucky. Esto pues, su Constitución establece que su Tribunal Supremo estará constituido por un Juez Presidente o Jueza Presidenta y 6 Jueces Asociados.[77] Además, el poder de nominación de los jueces en dicha jurisdicción recae en la

---

[76] Sin ánimo de ser exhaustivo, expongo algunas de estas jurisdicciones y la fuente en derecho que confiere a los miembros de la corte suprema el poder de selección de su Juez Presidente o Jueza Presidenta.

[77] "The Supreme Court shall consist of the Chief Justice of the Commonwealth and six associate Justices". Ky Const. Sec. 110.

figura del Gobernador del estado.[78] No obstante, distinto al caso nuestro, la Constitución de Kentucky expresamente establece que la figura del Juez Presidente de la Corte será seleccionada por sus pares.[79] Si bien el proceso de nominación de jueces y lenguaje sobre la composición de la Corte Suprema de Kentucky se asimila al nuestro, es innegable que en dicha jurisdicción los miembros de la Corte Suprema eligen a su Juez Presidente o Jueza Presidenta porque su Constitución así los faculta.

Otro caso muy persuasivo a esta controversia es el ocurrido ante la Corte Suprema de New Hampshire, en In re Petition of Governor, 151 N.H. 1 (2004). Por disposición expresa de su Constitución, ese Tribunal se compone de un Juez Presidente y cuatro Jueces Asociados, los cuales ocupan sus puestos hasta los 70 años, y son nombrados por el Poder Ejecutivo (el Gobernador y un Concilio Ejecutivo) sin la intervención del Poder Legislativo. Al igual que en Puerto Rico, la Constitución de New Hampshire no establece expresamente quién nombra al Juez Presidente o Jueza Presidenta. No obstante, desde 1901 todos los jueces

---

[78] "A vacancy in the office of a justice of the Supreme Court, or of a judge of the Court of Appeals, circuit or district court which under Section 152 of this Constitution is to be filled by appointment by the Governor shall be filled by the Governor from a list of three names presented to him by the appropriate judicial nominating commission." (Énfasis nuestro). Ky Const. Sec. 118.

[79] "The Justices of the Supreme Court shall elect one of their number to serve as Chief Justice for a term of four years". Ky Const. Sec. 110.

presidentes de esa Corte han sido nombrados por el Poder Ejecutivo ("*the Governor and an Executive Council.*").

En el 2003, la Legislatura de New Hampshire aprobó una ley que establecía, en síntesis, que a partir de su aprobación, el Juez Presidente o Jueza Presidenta del Tribunal Supremo sería el juez de más antigüedad en el Foro y ejercería su cargo por un término de cinco años, siendo sustituido al final de ese término por el segundo Juez Asociado de más antigüedad, y así sucesivamente. El Tribunal Supremo de New Hampshire señaló que esta ley buscaba desligar, por primera vez, las funciones administrativas tradicionalmente atribuidas al cargo de Juez Presidente de sus funciones adjudicativas.[80]

Inconformes con esa ley que les despojaba de su poder de nombrar al Juez Presidente o Jueza Presidenta, la Rama Ejecutiva cuestionó, en primer lugar, la facultad constitucional de la Rama Legislativa para llevar a cabo tal acción, en vista de que la Constitución de New Hampshire expresamente señala que "[t]odos los jueces serán nominados y nombrados por el gobernador y el concilio". ("*All judicial*

---

[80] Es menester señalar que en cuanto a la función administrativa del puesto de Juez presidente, el Art. 73-a de la Parte II de la Constitución de New Hampshire establece un lenguaje muy similar al Art. V, Sec. 3 de nuestra Constitución, al disponer lo siguiente:

The chief justice of the supreme court shall be the administrative head of all the courts. He shall, with the concurrence of a majority of the supreme court justices, make rules governing the administration of all courts in the state and the practice and procedure to be followed in all such courts. The rules so promulgated shall have the force and effect of law.

Véase N.H. Const. Pt. 2, Art. 73-a.

*officers ... shall be nominated and appointed by the governor and council[.]")*.[81]   En segundo lugar, la Rama Ejecutiva planteó que debido a sus funciones administrativas el puesto  de juez presidente de la corte suprema es separado y distinto del de juez asociado". (*"[T]he chief justice position on the supreme court is a separate and distinct office from that of associate justice"*).[82] Esto, ante el argumento de la Legislatura de New Hampshire de que la única función constitucional de un juez es adjudicativa, por lo que -en vista de que los deberes adjudicativos del Juez Presidente no difieren de los deberes de los Jueces Asociados- el cargo de Juez Presidente o Jueza Presidenta no es distinto ni separado del de los Jueces Asociados.  En otras palabras, que las funciones administrativas establecidas constitucionalmente para el puesto de Juez Presidente o Jueza Presidenta no son parte de sus deberes judiciales, sino más bien auxiliares e independientes a esa posición, por lo que el cargo de Juez Presidente no es separado del de los demás Jueces Asociados.

El Tribunal Supremo de New Hampshire resolvió, en primer lugar, que no había duda de que la Constitución reservaba el poder de nombrar a los jueces de la Rama Judicial únicamente al Poder Ejecutivo.  Además, señaló que tampoco existía duda con relación a que el término "jueces"

---

[81] In re Petition of Governor, 151 N.H. 1, 3 (2004).

[82] <u>In re Petition of Governor</u>, supra, pág. 3.

de la Constitución incluía al Juez Presidente. Establecer lo contrario, señaló ese Tribunal, sería "desafiar la lógica, la razón y la tradición".[83]

Con relación al argumento de que las funciones administrativas del Juez Presidente o Jueza Presidenta eran auxiliares e independientes a ese puesto, el Tribunal Supremo de New Hampshire señaló que el hecho de que las funciones administrativas del puesto de Juez Presidente o Jueza Presidenta no fueran de naturaleza adjudicativas, no significaba que estas funcionaran de manera auxiliar a los deberes judiciales del Juez Presidente o Jueza Presidenta. Más bien, estos poderes administrativos asignados constitucionalmente al cargo de Juez Presidente o Jueza Presidenta están unidos inseparablemente a su función adjudicativa y eran incidentales e inherentes a ese cargo.[84]

Por último, al declarar inconstitucional la ley, el Tribunal Supremo de New Hampshire señaló que la determinación de si el mecanismo de términos de cinco años rotativos para el puesto de Juez Presidente o Jueza Presidenta sirve mejor al fin público que el mecanismo de nominación y nombramiento por el Poder Ejecutivo, es un asunto que no le correspondía a esa Corte considerar. La pregunta que tenían ante sí, señala ese Tribunal, era si la

---

[83] In re Petition of Governor, supra, pág. 4.

[84] Íd., págs. 7-8.

Legislatura tenía el poder constitucional para realizar dicho cambio. El Tribunal Supremo de New Hampshire determinó que la Legislatura no tenía ese poder. ("*Whether the statutory mechanism of rotating 5-year terms for the chief justice position better serves the public than executive nomination and appointment is not a question for this court to consider. The question before us is whether the legislature is empowered by the constitution to declare it so. Our answer to this question is that the legislature is not so empowered.*").[85]

**Ahora bien, por otro lado es justo señalar que aunque la pretensión del peticionario en el caso de autos resulta incompatible con nuestro estado de Derecho actual, el mismo -con algunas variantes- es un mecanismo de selección bastante común en Estados Unidos.** Esto es, que los jueces que integran el Tribunal Supremo eligen  -por mayoría de entre ellos- quién será el Juez Presidente o Jueza Presidenta de la corte, no es una política minoritaria, sino mayoritaria en las jurisdicciones de Estados Unidos.  Así ocurre en 23 jurisdicciones, estas son: Alaska,[86] Arizona,[87]

---

[85] <u>In re Petition of Governor</u>, supra, pág. 8.

[86] "The chief justice shall be selected from among the justices of the supreme court by a majority vote of the justices. His term of office as chief justice is three years." Alaska Const. Art. IV, Sec. 2(b).

[87] "The chief justice shall be elected by the justices of the supreme court from one of their number for a term of five years, and may be reelected for like terms."  Ariz. Const. Art. VI, Sec. 3.

Colorado,[88] Florida,[89] Georgia,[90] Idaho,[91] Illinois,[92] Iowa,[93] Kentucky,[94] Michigan,[95] Missouri,[96] New Mexico,[97] North Dakota,[98] Oklahoma,[99] Oregon,[100] South Dakota,[101] Tennessee,[102]

---

[88] "The supreme court shall select a chief justice from its own membership to serve at the pleasure of a majority of the court, who shall be the executive head of the judicial system." Colo. Const. Art. VI, Sec. 5(2).

[89] "The chief justice of the supreme court shall be chosen by a majority of the members of the court." Fla. Const. Art. V, Sec. 2(b).

[90] "The Supreme Court shall consist of not more than nine Justices who shall elect from among themselves a Chief Justice as the chief presiding and administrative officer of the court and a Presiding Justice to serve if the Chief Justice is absent or is disqualified." Ga. Const. Art. VI, Sec. 6.

[91] "The chief justice shall be selected from among the justices of the Supreme Court by a majority vote of the justices. His term of office shall be four years." Idaho Const. Art. V, Sec. 6.

[92] "Supreme Court Judges shall select a Chief Justice from their number to serve for a term of three years." Ill. Const. Art. VI, Sec. 3.

[93] "The justices of the supreme court shall select one justice as chief justice, to serve during that justice's term of office." Iowa Code Sec. 602.4103.

[94] "The Justices of the Supreme Court shall elect one of their number to serve as Chief Justice for a term of four years." Ky Const. Sec. 110(5)(a).

[95] "One justice of the supreme court shall be selected by the court as its chief justice as provided by rules of the court." Mich. Const. Art. VI, Sec. 3.

[96] "The judges of the supreme court shall elect from their number a chief justice to preside over the court en banc…". Mo. Const. Art. V, Sec. 8.

[97] "The supreme court of the state shall consist of at least five justices who shall be chosen as provided in this constitution. One of the justices shall be selected as chief justice as provided by law." N.M. Const. Art. VI, Sec. 4.

"At their first meeting in April of each even-numbered year, the justices of the supreme court shall, by a majority vote, designate one of their number, not appointed, to serve as chief justice." N.M. Stat. Ann. Sec. 34-2-1(C).

[98] "The supreme court shall consist of five justices, one of whom shall be designated chief justice in the manner provided by law." N.D. Const. Art. VI, Sec. 2.

"The judges of the supreme court and district courts shall appoint from the members of the supreme court a chief justice who shall serve for a term of five years or until that justice's term expires, whichever shall first occur." N.D. St. Sec. 27-02-01.

Utah,[103] Virginia,[104] Washington,[105] Wisconsin,[106] Wyoming[107] y

West Virginia.[108]

---

[99] "The Justices shall choose from among their members a Chief Justice and a Vice Chief Justice." Okla. Const. Art. VII, Sec. 2.

[100] "The Chief Justice of the Supreme Court shall be a judge of the court selected by vote of a majority of the judges of the court." O.R.S. Sec. 2.045.

[101] "The Chief Justice of the Supreme Court shall be selected from among the justices of the Supreme Court by a majority vote of the justices for a term of four years without limitation in successive terms." SDCL Sec. 16-1-2.1.

[102] "After their election and qualification, the judges shall designate one (1) of their number who shall preside as chief justice." T. C. A. Sec. 16-3-102.

"On or before September 1 of each year, the members of the Court shall, by majority vote, elect a Justice to serve as the Chief Justice." Sup. Ct. Rules, Rule 32.

[103] "(1) The Supreme Court consists of five justices.

(…)

(3) The justices of the Supreme Court shall elect a chief justice from among the members of the court by a majority vote of all justices. The term of the office of chief justice is four years. The chief justice may serve successive terms. The chief justice may resign from the office of chief justice without resigning from the Supreme Court. The chief justice may be removed from the office of chief justice2 by a majority vote of all justices of the Supreme Court." U.C.A. 1953 Sec. 78A-3-101.

[104] "The Supreme Court shall consist of seven justices, any four of whom convened shall constitute a quorum. The Chief Justice shall be elected by majority vote of the justices of the Supreme Court to serve a term of four years. An eligible justice may decline to serve as Chief Justice, or a Chief Justice may resign as such, without thereby relinquishing his membership on the Court as a justice thereof." Va. Code Ann. Sec. 17.1-300.

[105] "The supreme court shall select a chief justice from its own membership to serve for a four-year term at the pleasure of a majority of the court as prescribed by supreme court rule." West´s RCWA Const. Art. IV, Sec. 3.

"A. Quadrennial Nomination and Election of Chief Justice. Commencing in November 1996 and continuing every four years thereafter, the Supreme Court shall select from among its membership a Chief Justice who will serve a four-year term. The term of the person so elected shall commence on the second Monday in January next succeeding the election. All members of the court at the time of the election, except those Justices who it is known will not be members of the court on the second Monday in January next, shall be eligible for election to the position, including the incumbent Chief Justice and Justices who have less than four years to serve on their current term of office.

_____
Nominations for the position of Chief Justice shall be made orally at the meeting of the court at which the election is conducted. All Justices on the court at the time the election is held are eligible to vote. The vote shall be by secret ballot and the Justice receiving a majority of the votes of the full court shall be deemed elected to the position.

B. Resignation of a Chief Justice and Election of a Successor. The Chief Justice may resign at any time from that position without resigning from the court. In that event or in the event of the death, resignation, or removal of the Chief Justice, the remaining Justices of the court shall elect a successor to the position of Chief Justice in the same manner as the quadrennial election of a Chief Justice. The Justice so elected shall serve the remainder of the term of the Chief Justice that Justice replaces.

The Chief Justice shall be the executive officer of the court preside at all sessions of the Supreme Court and shall do and perform those duties required of the Chief Justice by the constitution and laws of the State of Washington and the rules of this court, and shall serve as coordinator between the two departments." Supreme Court Administrative Rules, SAR 8.

[106] "The chief justice of the supreme court shall be elected for a term of 2 years by a majority of the justices then serving on the court. The justice so designated as chief justice may, irrevocably, decline to serve as chief justice or resign as chief justice but continue to serve as a justice of the supreme court." Wis. Stat. Ann. Const. Art. VII, Sec. 4.

[107] "The supreme court of the state shall consist of not less than three nor more than five justices as may be determined by the legislature. The justices of the court shall elect one of their number to serve as chief justice for such term and with such authority as shall be prescribed by law. A majority of the justices shall constitute a quorum, and a concurrence of a majority of such quorum shall be sufficient to decide any matter. If a justice of the supreme court for any reason shall not participate in hearing any matter, the chief justice may designate one of the district judges to act for such nonparticipating justice." Wyo. Const. Art. V, Sec. 4.

"The supreme court of Wyoming shall consist of five (5) justices. The justices shall choose one (1) of their number to serve as chief justice, who shall serve at the pleasure of a majority of the court. The supreme court is the head of the state judicial system, and the chief justice is the chief administrator of the duties prescribed by law to be performed by the court." W.S. 1977 Sec. 5-2-102.

[108] "The supreme court of appeals shall consist of five justices. (…) Provision shall be made by rules of the supreme court of appeals for the selection of a member of the court to serve as chief justice thereof." W. Va. Const. Art. VIII, Sec. 2.

"The court shall designate one of its justices to be chief justice of the court for such term as the court may determine by order made and entered of record. In the absence of the chief justice, any other justice designated by the justices present shall act as chief justice." W. Va. Code, Sec. 51-1-2.

Por otra parte, al igual que nosotros, unas trece jurisdicciones -aunque con múltiples variantes- han depositado el poder de nominación del Juez Presidente o Jueza Presidenta en el Gobernador del estado. Éstas son, California,[109] Delaware,[110] Maine,[111] Maryland,[112] Nebraska,[113] New York,[114] Connecticut,[115] Hawaii,[116] Vermont,[117]

---

[109] "The Judge appointed by the Governor as Chief Judge shall be the administrative head of the Court during the term of his or her appointment." Cal. Const. Art. VI, Sec. 6.

[110] "There shall be five Justices of the Supreme Court who shall be citizens of the State and learned in the law. One of them shall be the Chief Justice who shall be designated as such by his or her appointment and who when present shall preside at all sittings of the Court. In the absence of the Chief Justice the Justice present who is senior in length of service shall preside. If it is otherwise impossible to determine seniority among the Justices, they shall determine it by lot and certify accordingly to the Governor." Del. Code Ann. Const. Art. IV, Sec. 2.

[111] "The Governor shall nominate, and, subject to confirmation as provided herein, appoint all judicial officers, except judges of probate and justices of the peace if their manner of selection is otherwise provided for by this Constitution or by law, and all other civil and military officers whose appointment is not by this Constitution, or shall not by law be otherwise provided for." Me Rev. Stat. Ann. Const. Art. V, Pt. 1, Sec. 8.

[112] "[…]One of the Judges of the Court of Appeals shall be designated by the Governor as the Chief Judge.[…]" Md. Const. Art. IV, Sec. 14.

[113] "In the case of any vacancy in the Supreme Court or in any district court or in such other court or courts made subject to this provision by law, such vacancy shall be filled by the Governor from a list of at least two nominees presented to him by the appropriate judicial nominating commission.

(…)

(4)    There    shall    be    a    judicial nominating commission    for the Chief Justice of the Supreme Court and one for each judicial district of the Supreme Court and of the district court and one for each area or district served by any other court made subject to subsection (1) of this section by law." Neb. Rev. Stat. Const. Art. V, Sec. 21.

[114] "The governor shall appoint, with the advice and consent of the senate, from among those recommended by the judicial nominating commission, a person to fill the office of chief judge or associate judge, as the case may be, whenever a vacancy occurs in the court of appeals; provided, however, that no person may be appointed a judge of the court of appeals unless such person is a resident of the state and has been admitted to the practice of law in this state for at least ten years. The governor shall transmit to the senate the written report of

Massachusetts,[118] New Hampshire,[119] New Jersey,[120] y Rhode Island.[121]    Entre estas jurisdicciones existe una gran

_____

the commission on judicial nomination relating to the nominee." N.Y. Const. Art. VI, Sec. 2.

[115] "Judges of all courts, except those courts to which judges are elected, shall be nominated by the Governor exclusively from the list of candidates or incumbent judges submitted by the Judicial Selection Commission. Any candidate or incumbent judge who is nominated from such list by the Governor to be Chief Justice of the Supreme Court, and who is appointed Chief Justice by the General Assembly, shall serve a term of eight years from the date of appointment." Conn. Gen. Stat. Ann. Sec. 51-44a.

[116] "The governor, with the consent of the senate, shall fill a vacancy in the office of the chief justice, supreme court, intermediate appellate court and circuit courts, by appointing a person from a list of not less than four, and not more than six, nominees for the vacancy, presented to the governor by the judicial selection commission." Haw. Const. Art. VI, Sec. 3.

[117] "The Governor, with the advice and consent of the Senate, shall fill a vacancy in the office of the Chief justice of the State, associate justice of the Supreme Court or judge of any other court, except the office of Assistant Judge and of Judge of Probate, from a list of nominees presented by a judicial nominating body established by the General Assembly having authority to apply reasonable standards of selection." Vt. Const. CH II, Sec. 32.

[118] "All judicial officers, [the attorney-general,] the solicitor-general, [all sheriffs,] coroners, [and registers of probate,] shall be nominated and appointed by the governor, by and with the advice and consent of the council; and every such nomination shall be made by the governor, and made at least seven days prior to such appointment." Mass. Gen. Laws Ann. Const. Pt. 2, C. 2, Sec. 1,   Art. 9.

[119] "The supreme court shall consist of 5 justices appointed and commissioned as prescribed by the constitution. On the effective date of this section, the administrative position of chief justice shall be held by the justice with the most seniority on the court for a period of up to 5 years. Each succeeding chief justice shall serve for a period of up to 5 years and shall be the justice with the most seniority of service on the court who has not yet served as chief justice. A justice may decline to serve as chief justice; however, no justice shall be permitted to serve successive terms as chief justice. In the event that all 5 justices have served a term as chief justice, succeeding chief justices shall serve rotating 5-year terms based on seniority." N.H. Rev. Stat. Ann. Sec. 490:1.

No obstante, la Corte Suprema de New Hampshire declaró inconstitucional este estatuto en In re Petion of the Governor and Executive Council, 151 N.H. 1 (2004). Esto pues, principalmente, la Constitución del estado definía el cargo de Juez Presidente o Jueza Presidenta como un cargo distinto al de los Jueces Asociados, por lo que la Asamblea Legislativa no podía disponer que el cargo se pasaría entre los miembros de la Corte

diversidad de procedimientos para regular la nominación que realiza el gobernador. Por ejemplo, Connecticut requiere que el nombramiento realizado por el Gobernador se circunscriba a la selección de uno de los candidatos previamente recomendados por un Comité de Evaluación Judicial.[122] Mientras, el estado de Maine faculta al Gobernador a hacer la nominación del Juez Presidente o Jueza Presidenta a su discreción, pero requiere el consejo y consentimiento del Senado del estado.[123] Por otra parte, en Maryland el Gobernador tiene total discreción para designar cuál de los miembros de su Corte Apelativa ha de ser el Juez o Jueza que los presida, sin necesidad de que otro cuerpo confirme la nominación.

_____

Suprema, ignorando el proceso de nominación por el Gobernador para ese cargo.

[120] "The Governor shall nominate and appoint, with the advice and consent of the Senate, the Chief Justice and associate justices of the Supreme Court, the Judges of the Superior Court, and the judges of the inferior courts with jurisdiction extending to more than one municipality; except that upon the abolition of the juvenile and domestic relations courts or family court and county district courts as provided by law, the judges of those former courts shall become the Judges of the Superior Court without nomination by the Governor or confirmation by the Senate. No nomination to such an office shall be sent to the Senate for confirmation until after 7 days' public notice by the Governor." N.J.S.A. Const. Art. VI, Sec. 6.

[121] "The governor shall fill any vacancy of any justice of the Rhode Island Supreme Court by nominating, on the basis of merit, a person from a list submitted by an independent non-partisan judicial nominating commission, and by and with the advice and consent of the senate, and by and with the separate advice and consent of the house of representatives, shall appoint said person as a justice of the Rhode Island Supreme Court." R.I. Const. Art. X, Sec. 4.

[122] Conn. Gen. Stat. Ann. Sec. 51-44a.

[123] Me Rev. Stat. Ann. Const. Art. 5, Pt. 1, Sec. 8.

Además, hay 5 estados en los que rige el concepto de antigüedad al momento de seleccionar al Juez Presidente o Jueza Presidenta. Esto es, que los integrantes del Tribunal Supremo seleccionan de entre ellos a quien los dirigirá como Corte, ello de acuerdo a la antigüedad de sus miembros. Valga aclarar que la antigüedad se refiere al servicio ininterrumpido en el Tribunal Supremo de la jurisdicción particular. Los estados que cuentan con este tipo de selección del Juez Presidente o Jueza Presidenta son: Kansas,[124] Louisiana,[125] Mississippi,[126] Nevada,[127] y Pennsylvania[128].

---

[124] "The justice who is senior in continuous term of service shall be chief justice, and in case two or more have continuously served during the same period the senior in age of these shall be chief justice." Kan. Const. Art. III, Sec. 2.

[125] "The judge oldest in point of service on the supreme court shall be chief justice. He is the chief administrative officer of the judicial system of the state, subject to rules adopted by the court." La. Const. Art. V, Sec. 6.

[126] "The judge of the Supreme Court who has been for the longest time continuously a member of the court shall be chief justice." Miss. Code Ann. Sec. 9-3-11 (West).

[127] "The justices of the Supreme Court, shall be elected by the qualified electors of the State at the general election, and shall hold office for the term of six years from and including the first Monday of January next succeeding their election; provided, that there shall be elected, at the first election under this Constitution, three justices of the Supreme Court who shall hold office from and including the first Monday of December A.D., eighteen hundred and sixty four, and continue in office thereafter, two, four and six years respectively, from and including the first Monday of January next suceeding [succeeding] their election. They shall meet as soon as practicable after their election and qualification, and at their first meeting shall determine by lot, the term of office each shall fill, and the justice drawing the shortest term shall be Chief Justice, and after the expiration of his term, the one having the next shortest term shall be Chief Justice, after which the senior justice in commission shall be Chief Justice; and in case the commission of any two or more of said justices shall bear the same date, they shall determine by lot, who shall be Chief Justice." Nev. Const. Art. VI, Sec. 3.

En Indiana[129] y Washington, D.C.,[130] el mecanismo para seleccionar a un Juez Presidente o Jueza Presidenta es mediante una comisión nominadora. En ambos casos se requiere que el candidato nominado sea uno de los jueces que integre el Tribunal Supremo de esa jurisdicción.

Otro método de selección del Juez Presidente o Jueza Presidenta que se utiliza en otras siete (7) jurisdicciones es la elección popular por la ciudadanía.[131] Una vez se ha elegido por voto popular al Juez Presidente o Jueza Presidenta, no es necesario ningún proceso de confirmación por otro cuerpo o comité.[132] Los estados que utilizan este mecanismo son Alabama,[133] Arkansas,[134] Montana,[135] North Carolina,[136] Minnesota,[137] Ohio[138] y Texas.[139]

---

[128] "The Chief Justice and president judges of all courts with seven or less judges shall be the justice or judge longest in continuous service on their respective courts."  Pa. Const. Art. V, Sec. 10(d).

[129] "The Chief Justice of the State shall be selected by the judicial nominating commission from the members of the Supreme Court and he shall retain that office for a period of five years…". Ind. Const. Art. VII, Sec. 3.

[130] "The chief judge of a District of Columbia court shall be designated by the District of Columbia Judicial Nominating [Nomination] Commission established by § 1-204.34 from among the judges of the court in regular active service…"  DC ST Sec. 1-204.31(b) (West 2001).

[131] L. Rivera Méndez, Chief Justice of Puerto Rico´s Supreme Court: A Gubernatorial Appointment? 84 Rev. Jur. U.P.R. 1077, 1090-1091 (2015).

[132] Íd.

[133] "The supreme court shall be the highest court of the state and shall consist of one chief justice and such number of associate justices as may be prescribed by law." Ala. Const. Art. VI, Sec. 140.

_____

"All judges shall be elected by vote of the electors within the territorial jurisdiction of their respective courts." Ala. Const. Art. VI, Sec. 152.

[134] "(A) The Supreme Court shall be composed of seven Justices, one of whom shall serve as Chief Justice. The Justices of the Supreme Court shall be selected from the State at large.

(B) The Chief Justice shall be selected for that position in the same manner as the other Justices are selected. During any temporary period of absence or incapacity of the Chief Justice, an acting Chief Justice shall be selected by the Court from among the remaining justices." AR Const. Amend. 80, Sec. 2.

"(A) Supreme Court Justices and Court of Appeals Judges shall be elected on a nonpartisan basis by a majority of qualified electors voting for such office. Provided, however, the General Assembly may refer the issue of merit selection of members of the Supreme Court and the Court of Appeals to a vote of the people at any general election. If the voters approve a merit selection system, the General Assembly shall enact laws to create a judicial nominating commission for the purpose of nominating candidates for merit selection to the Supreme Court and Court of Appeals." AR Const. Amend. 80, Sec. 18.

[135] "(1) The supreme court consists of one chief justice and four justices, but the legislature may increase the number of justices from four to six. A majority shall join in and pronounce decisions, which must be in writing." Mont. Const. Art. VII, Sec. 3.

(1) Supreme court justices and district court judges shall be elected by the qualified electors as provided by law.

(2) For any vacancy in the office of supreme court justice or district court judge, the governor shall appoint a replacement from nominees selected in the manner provided by law. If the governor fails to appoint within thirty days after receipt of nominees, the chief justice or acting chief justice shall make the appointment from the same nominees within thirty days of the governor's failure to appoint. Appointments made under this subsection shall be subject to confirmation by the senate, as provided by law. If the appointee is not confirmed, the office shall be vacant and a replacement shall be made under the procedures provided for in this section. The appointee shall serve until the election for the office as provided by law and until a successor is elected and qualified. The person elected or retained at the election shall serve until the expiration of the term for which his predecessor was elected. No appointee, whether confirmed or unconfirmed, shall serve past the term of his predecessor without standing for election.

[136] "(a) The Supreme Court shall consist of a Chief Justice and six associate justices, elected by the qualified voters of the State for terms of eight years." NC ST Sec. 7A-10.

[137] "The supreme court consists of one chief judge and not less than six nor more than eight associate judges as the legislature may establish." M.S.A. Const. Art. VI, Sec. 2.

"The term of office of all judges shall be six years and until their successors are qualified. They shall be elected by the voters from the area which they are to serve in the manner provided by law." M.S.A. Const. Art. VI, Sec. 7.

Por su parte, South Carolina es la única jurisdicción en la cual el Juez Presidente o Jueza Presidenta es seleccionada por la Asamblea Legislativa, sin interferencia del gobernador ni de alguna Comisión de Evaluación Judicial.[140] La Corte Suprema está constituida por un Juez Presidente o Jueza Presidenta y 4 Jueces Asociados o Juezas

---

[138] "(A) The supreme court shall, until otherwise provided by law, consist of seven judges, who shall be known as the chief justice and justices."  OH Const. Art. IV, Sec. 2.

"(A) (1) The chief justice and the justices of the supreme court shall be elected by the electors of the state at large, for terms of not less than six years." OH Const. Art. IV, Sec. 6.

[139] El estado de Texas tiene dos cortes que atienden casos en última instancia dependiendo de su naturaleza, esto es, casos civiles o penales. En lo relativo a lo civil, su Constitución establece lo siguiente:

"Sec. 2. (a) The Supreme Court shall consist of the Chief Justice and eight Justices, any five of whom shall constitute a quorum, and the concurrence of five shall be necessary to a decision of a case; provided, that when the business of the court may require, the court may sit in sections as designated by the court to hear argument of causes and to consider applications for writs of error or other preliminary matters.

(b) No person shall be eligible to serve in the office of Chief Justice or Justice of the Supreme Court unless the person is licensed to practice law in this state and is, at the time of election, a citizen of the United States and of this state, and has attained the age of thirty-five years, and has been a practicing lawyer, or a lawyer and judge of a court of record together at least ten years.

(c) Said Justices shall be elected (three of them each two years) by the qualified voters of the state at a general election; shall hold their offices six years; and shall each receive such compensation as shall be provided by law." Vernon's Ann. Texas Const. Art. V,    Sec. 2.

En cuanto a los casos penales, su Constitución establece que:

"Sec. 4. (a) The Court of Criminal Appeals shall consist of eight Judges and one Presiding Judge. The Judges shall have the same qualifications and receive the same salaries as the Associate Justices of the Supreme Court, and the Presiding Judge shall have the same qualifications and receive the same salary as the Chief Justice of the Supreme Court. The Presiding Judge and the Judges shall be elected by the qualified voters of the state at a general election and shall hold their offices for a term of six years." Vernon's Ann. Texas Const. Art. V, Sec. 4.

[140] Rivera Méndez, *supra*, págs. 1091-1092.

Asociadas.[141] Los miembros de dicha Corte se eligen por el voto mayoritario de los dos cuerpos legislativos del estado por el término de 10 años.[142]

Como es evidente, el sistema adoptado por nuestros delegados constituyentes no es compartido por la mayoría de los estados, sino por una minoría de éstos. No obstante, fue el mecanismo que estos delegados -por las razones que fueran- decidieron elegir y que el Pueblo finalmente avaló al ratificar mediante referéndum nuestra Ley Soberana. Como señalé, no le corresponde a esta Curia cambiar esa realidad. La Secs. 1 al 3 del Art. VII de nuestra Constitución establecen la forma en que el Pueblo de Puerto Rico, mediante el voto libre y democrático, puede enmendar nuestra Carta Magna.[143] Sólo así puede alcanzarse lo que el peticionario reclama.

En fin, resolver que el proceso de selección de la persona que ocupará el cargo de Juez Presidente del Tribunal Supremo está exento del requisito de nombramiento por parte del Gobernador tendría el efecto de violentar la disposición

---

[141] "The Supreme Court shall consist of a Chief Justice and four Associate Justices, any three of whom shall constitute a quorum for the transaction of business. The Chief Justice shall preside, and in his absence the senior Associate Justice." S.C. Const. Art. V,  Sec. 2.

[142] "The members of the Supreme Court shall be elected by a joint public vote of the General Assembly for a term of ten years, and shall continue in office until their successors shall be elected and qualified, and shall be classified so that the term of one of them shall expire every two years." S.C. Const. Art. V, Sec. 3.

[143] Art. VII, Secs. 1-3, Const. ELA, LPRA, Tomo 1.

constitucional que expone claramente que "los jueces serán nombrados por el Gobernador con el consejo y consentimiento del Senado". Art. V, Sec. 8 de nuestra Constitución.

Al interpretar integralmente las disposiciones legales aplicables, y añadiendo que la Convención Constituyente no delegó ni pretendió delegar a los Jueces del Tribunal Supremo la elección de su Juez Presidente o Jueza Presidenta, estoy seguro que el nombramiento del Juez Presidente o Jueza Presidenta del Tribunal reside en el Gobernador de Puerto Rico con el consejo y consentimiento del Senado. Es por ello que le corresponde al Pueblo, y no a esta Corte, decidir si dispondrán de un nuevo mecanismo.

Por otro lado, y con relación a la sanción impuesta al peticionario, me veo forzado a señalar lo siguiente. Aunque estoy conforme con la Opinión del Tribunal respecto a que el peticionario no contaba con legitimación activa y tampoco le asistía la razón en cuanto al aspecto sustantivo de la controversia planteada, disiento en lo relativo a que la misma fuera una frívola. Distinto al caso de Nieves Huertas v. ELA, 189 DPR 611 (2013) (Sentencia), la controversia en este caso requería -en el aspecto sustantivo- una explicación del contexto constitucional e incluso un análisis histórico de la cláusulas en cuestión y del Diario de Sesiones de la Convención Constituyente, como lo

demuestra la Opinión del Tribunal y los Votos de Conformidad.

Además, no debemos pasar por alto que la teoría del peticionario es un asunto que se ha discutido públicamente por los últimos años, lo que ha motivado incluso artículos de revista jurídica y varias columnas en los principales diarios del País. De manera que, sin entrar en cuáles fueron sus motivaciones, lo cierto es que la acción del peticionario nos permite de una vez y por todas expresarnos con relación a un asunto que entiendo no se encontraba del todo claro en la mente de muchas personas en nuestro amado Pueblo.

**III**

Por los fundamentos expuestos, estoy conforme con que se expida el recurso de certificación y se ordene la desestimación de la demanda presentada por el peticionario por el fundamento de falta de legitimación activa. Sin embargo, disiento con relación a la sanción impuesta al peticionario.

Erick V. Kolthoff Caraballo
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Hiram J. Torres Montalvo<br><br>    Peticionario<br><br>        v.<br><br>Hon. Alejandro García Padilla, Gobernador del Estado Libre Asociado de Puerto Rico<br><br>    Recurrido | CT-2016-0003 | Certificación Intrajurisdiccional |

Opinión concurrente en parte y disidente en parte emitida por la Jueza Asociada señora Pabón Charneco

En San Juan, Puerto Rico, a 7 de marzo de 2016.

Estoy conforme con la decisión de una Mayoría de este Tribunal de preterir del trámite ordinario y certificar el caso de autos. De igual manera, estoy conforme con el resultado anunciado en la Opinión que antecede en cuanto a que procede desestimar el caso de epígrafe. Siempre he sido consistente en mi postura de certificar casos de alto interés y trascendencia pública en el que solo existen controversias de derecho.[144] Véase, *Rivera Schatz v. ELA, et als.* 191 DPR 449 (2014); *AMPR et als. v. Sist. Retiro*

---

[144] En el pasado, ante una situación análoga a la que hoy atendemos, seguimos el mismo curso de acción y utilizamos el mecanismo de certificación intrajurisdiccional para atender prontamente el asunto ante nuestra consideración. Véase, *Nieves Huertas v. ELA I*, 189 DPR 611 (2013) (Sentencia)(La Jueza Asociada señora Pabón Charneco no intervino). Sorprendentemente, una integrante de este Tribunal que en aquella ocasión tildó el proceder de la Mayoría del Tribunal como un "ejercicio desmedido de poder" y una intervención a "destiempo" y "atropellada", paradójicamente hoy está conteste con certificar la controversia de autos. *Íd.* Me conforta que con el pasar del tiempo la compañera ya no esté tan renuente a utilizar el mecanismo de certificación intrajurisdiccional para casos adecuados. Parecería ser que el tiempo la ha hecho recapacitar en cuanto al uso de este importante mecanismo, ¿o será que, en esta ocasión particular, cambió el color del cristal con que miró la controversia?

*Maestros II*, 190 D.P.R. 88 (2014). Hoy, al igual que en otras ocasiones, me reafirmo en ese proceder. Máxime en una controversia como la de autos en la cual integrantes de una de las ramas políticas de Gobierno han puesto en entredicho la integridad de este Foro y, con ello, han lacerado la confianza del Pueblo en la Rama Judicial. Por lo tanto, el curso adecuado era certificar la controversia de autos y resolver con premura el caso de epígrafe, disipando la incertidumbre y desconfianza orquestada por el propio Senado de Puerto Rico y que ha tenido el efecto de mancillar la integridad de esta Institución. ¿Las razones para su proceder? La historia las juzgará.

Por entender que el peticionario de epígrafe no posee legitimación activa para instar la Demanda de epígrafe y que, por lo tanto, carecemos de jurisdicción para resolver la misma, estoy conforme con la decisión anunciada por una Mayoría de desestimar el caso de autos. No obstante, ya que el Demandante no ostenta legitimación activa, considero que toda discusión de los méritos de la controversia planteada constituye un dictamen **nulo** y un *obiter dictum.* Por ende, me veo obligada a concurrir.

I

Con suma frecuencia los integrantes de esta Curia nos enfrentamos a casos y controversias cuyas consecuencias son de alto interés público. No obstante, en aras de proteger el fino balance del sistema republicano de gobierno y la legitimidad de los poderes constitucionales de este Tribunal, hemos reiterado que solo podemos examinar aquellos casos que son justiciables. *P.I.P. v.*

*E.L.A. et al.*, 186 DPR 1, 11 (2012); *Asoc. Fotoperiodistas v. Rivera Schatz*, 180 DPR 920, 931 (2011); *Moreno v. Pres. U.P.R. II*, 178 DPR 969 (2010); *E.L.A. v. Aguayo*, 80 DPR 552 (1958). Como es conocido, la justiciabilidad es una doctrina de autolimitación de los tribunales en respuesta al poder de revisión judicial.

Uno de los requisitos de "justiciabilidad necesarios para dar paso al ejercicio de la función judicial es el que los litigantes ostentes legitimación activa". *P.I.P. v. E.L.A. et al.*, supra, pág. 11. Véase, *Asoc. Fotoperiodistas v. Rivera Schatz*, supra, pág. 942. El propósito de este principio elemental de autolimitación es que el promovente de la acción posea un interés real y genuino en la resolución de la controversia. *P.I.P. v. E.L.A. et al.*, supra, pág. 11.

Para cumplir con el requisito de legitimación activa el reclamante tiene que demostrar lo siguiente: (1) que ha sufrido un daño claro y palpable; (2) el daño es real, inmediato y preciso, y no abstracto e hipotético; (3) existe una relación causal razonable entre la acción ejercitada y el daño alegado; y (4) la causa de acción debe surgir al amparo de la Constitución o de alguna ley. *P.I.P. v. E.L.A. et al.*, supra, pág. 12; *Fund. Surfrider y otros v. A.R.Pe.*, supra, pág. 572; *Asoc. Fotoperiodistas v. Rivera Schatz*, supra, pág. 943.

Asismismo hemos reiterado que al examinar una solicitud de desestimación por falta de jurisdicción debemos dar por ciertas todas las alegaciones fácticas bien alegadas en la demanda e interpretarlas a favor de la

parte demandante. *Asoc. Fotoperiodistas v. Rivera Schatz*, supra, pág. 935.

En el presente caso, la parte demandante aduce que es abogado de profesión y que la confirmación de la Hon. Maite D. Oronoz Rodríguez como Jueza Presidenta del Tribunal Supremo de Puerto Rico constituye una violación a las Secciones 7 y 8 de nuestra Constitución. Sostiene, además, que de prevalecer dicha confirmación se le estaría confiriendo la facultad de administrar la Rama Judicial a una persona mediante un procedimiento sin fundamento legal.

Aun tomando como ciertas las alegaciones de la parte peticionaria, este no ha podido demostrar que el nombramiento de la Hon. Maite D. Oronoz Rodríguez le haya causado un daño claro, real, inmediato y preciso a sus funciones como abogado. Por el contrario, las alegadas violaciones constitucionales a las cuales hace referencia el peticionario, en todo caso, son cuestiones generalizadas que no cumplen con el estándar de legitimación activa autoimpuesto por este Tribunal. Véase, en general, *Fund. Arqueológica v. Depto. de la Vivienda*, 109 DPR 387 (1980). Véase, además, *Warth v. Seldin*, 422 U.S. 490 (1975). A esos extremos estoy conforme con la Sentencia dictada hoy por este Tribunal.

Lo anterior era suficiente para disponer de la controversia planteada en el recurso de epígrafe. Sin embargo, una Mayoría de este Tribunal ha decidido entrar a resolver los méritos del nombramiento impugnado judicialmente. Por entender que es totalmente innecesario

e impropio dilucidar los méritos de las controversias constitucionales planteadas ante nos, no puedo prestar un voto de conformidad.

Aunque parezca trillado, es mi deber constitucional señalar que este Tribunal ha reiterado en un sinnúmero de ocasiones el principio de autolimitación constitucional que consiste en que

> [u]na vez surge por indicación de las partes o de algún otro modo que el tribunal carece de jurisdicción, entra en operación el inciso (c) de la Regla 10.8 de Procedimiento Civil de 2009 (32 L.P.R.A. Ap. V), que ordena la desestimación del pleito. Las cuestiones jurisdiccionales deben ser resueltas con preferencia, y de determinar un tribunal que carece de jurisdicción, **"debe desestimar … la reclamación 'sin entrar a los méritos de la cuestión ante sí'"**.

*Asoc. Fotoperiodistas v. Rivera Schatz*, supra, pág. 936; citando *González v. Mayagüez Resort Casino*, 176 DPR 848, 856 (2009), y *González Santos v. Bourns P.R., Inc.*, 125 DPR 48, 63 (1989).

En la medida en que el presente caso no es justiciable, este Tribunal carece de jurisdicción y, por ende, procede automáticamente la desestimación del pleito sin entrar a los méritos de la cuestión presentada. *Id.*

Este Tribunal ha sido muy riguroso al momento de auscultar su jurisdicción y desestimar aquellos casos que no son justiciables. Basta meramente recordar las ocasiones más recientes en las que hemos sido firmes al desestimar cuando un caso no es justiciable. Véanse, *Lozada Sánchez v. JCA*, 184 DPR 898 (2012)(Martínez Torres, J.); *Asoc. Fotoperiodistas v. Rivera Schatz*, 180 DPR 920

(2011) (Martínez Torres, J.); *Fund. Surfrider y otros v. A.R.Pe.*, 178 DPR 563 (2010)(Martínez Torres, J.); *Moreno v. Pres. U.P.R. II*, 178 DPR 969 (2010)(Martínez Torres, J.).[145]

Parecería ser que esta norma es inaplicable a una Mayoría de este Tribunal que en lugar de desestimar, entra a decidir cuestiones constitucionales sin tener jurisdicción para ello. Entiende esa Mayoría que el "alto interés público que reviste el asunto ante nos…" y la dignidad de este Tribunal así lo ameritan. No puedo estar conforme con este tipo de inconsistencia que deslegitimiza nuestra autoridad en el contexto de la revisión judicial y el sistema republicano de gobierno.

Desde *E.L.A. v. Aguayo*, supra, establecimos claramente que el interés público en un asunto no era razón suficiente para dilucidar los méritos de un caso que no es justiciable. Sin embargo, hoy una Mayoría de este Tribunal prestó su voto para deshacer nuestros pronunciamientos en torno a las doctrinas de autolimitación. En otras palabras, esa Mayoría acaba de convertir esta Curia en una tercera cámara o consejo supremo tal y como advertimos hace aproximadamente cincuenta y ocho (58) años en *E.L.A. v. Aguayo*, supra, págs. 601-602.

Si bien entiendo que este es un proceder patentemente erróneo, al menos me conforta saber que la Opinión

---

[145] El Juez Asociado señor Martínez Torres hoy da un giro inesperado y con su voto de conformidad a la Opinión que antecede, abandona una progenie de casos de su autoría en los cuales es férreo en reafirmar que la falta de legitimación activa de una parte demandante priva a un tribunal de jurisdicción para resolver en los méritos la demanda presentada ante su consideración.

Mayoritaria no constituye precedente toda vez que la discusión en torno a los méritos de las controversias constitucionales fue emitido por un Tribunal que carece de jurisdicción. Véanse, *Pagán v. Alcalde Mun. De Cataño*, 143 DPR 314 (1997); *González Santos v. Bourns P.R., Inc.*, 125 DPR 48 (1989)(Un tribunal que carece jurisdicción solo tiene jurisdicción para señalar que no la tiene). Por tal razón, todos los dictámenes incluidos en los acápites III y IV son **nulos** y constituyen un mero *obiter dictum*.

Por último, disiento del proceder de la Mayoría que insiste en imponerle al peticionario una sanción de honorarios de abogado sin un análisis real de los criterios que hemos establecido jurisprudencialmente para determinar la procedencia de la imposición de ese tipo de penalidad. Si bien es cierto que el peticionario carece de legitimación activa, también es cierto que el asunto planteado ha generado un gran debate en la comunidad jurídica. Es por ello que no puedo concluir que la conducta del peticionario constituye frivolidad o temeridad. Más aun, me parece que la Opinión Mayoritaria tiene el peligroso efecto de disuadir a que los ciudadanos acudan a los tribunales a presentar sus reclamos.

Mildred G. Pabón Charneco
Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Hiram Torres Montalvo

     Parte Peticionaria

       v.

Hon. Alejandro García
Padilla, Gobernador del
Estado Libre Asociado de
Puerto Rico

     Parte Promovida

Certificación

CT-2016-0003

**Opinión concurrente en parte y disidente en parte emitida por el Juez Asociado señor RIVERA GARCÍA.**

En San Juan, Puerto Rico, a 7 de marzo de 2016.

Consistente con mi postura sobre el uso adecuado de los recursos de certificación intrajurisdiccional para asuntos excepcionales de alto interés público que ameriten la preterición de los trámites judiciales ordinarios, estoy conforme con la determinación que hoy toma este Tribunal de acoger el recurso peticionado con el objetivo de desestimar la demanda presentada por el Lcdo. Hiram Torres Montalvo por falta de legitimación activa. Deseo, sin embargo, comentar muy brevemente sobre varios aspectos circundantes a este caso que ameritan ser resaltados. En primer orden, intereso abundar sobre el desafortunado y

erróneo curso de acción que optan por tomar cinco miembros de este Tribunal de resolver mediante opinión una controversia que simple y sencillamente no es justiciable ante la ausencia de capacidad jurídica del demandante para incoar la acción judicial ante nuestra consideración. En segundo orden, intereso comentar sobre ciertas expresiones que durante los pasados días varios miembros de las ramas políticas locales han formulado sobre presuntas agendas escondidas por parte de algunos miembros de este Tribunal.

## I

El 12 de febrero de 2016, el Gobernador de Puerto Rico, Hon. Alejandro García Padilla, nominó a la compañera Hon. Maite D. Oronoz Rodríguez, entonces Jueza Asociada, para ocupar el puesto de Jueza Presidenta del Tribunal Supremo de Puerto Rico. Siguiendo el trámite ordinario para este tipo de nombramiento que requiere la confirmación del Senado, la nominación de la compañera Jueza debió pasar a la consideración de la Oficina de Evaluaciones Técnicas de Nombramientos adscrita al referido órgano legislativo. Esta oficina sería entonces la encargada de, al menos inicialmente, investigar a la designada sobre asuntos personales, profesionales y económicos pertinentes a su designación. Este informe pasaría entonces ante la consideración de la Comisión de lo Jurídico, Seguridad y Veteranos del Senado, quien entonces debía comenzar un proceso de vistas públicas en las cuales los ciudadanos interesados podían acudir a expresar su conformidad o rechazo con la designación

realizada por el señor Gobernador. Subsiguientemente, esta Comisión emitiría un informe positivo o negativo dirigido a todos los miembros del Senado con sus hallazgos y recomendaciones sobre la nominada.

El 22 de febrero de 2016, en completa inobservancia de ese proceso ordinario, una mayoría del Senado optó por considerar mediante el mecanismo del descargue la nominación de la entonces Jueza Asociada señora Oronoz Rodríguez. De esta forma, todos los senadores y senadoras emitieron sus respectivos votos a favor o en contra de la referida nominación, quedando finalmente confirmada por una votación de 15 votos a favor y 12 votos en contra. En esa misma fecha del 22 de febrero de 2016 el Lcdo. Hiram J. Torres Montalvo presentó ante el Tribunal de Primera Instancia una demanda de interdicto, preliminar y permanente, y solicitud de sentencia declaratoria. En ésta, el licenciado Torres Montalvo cuestionó, en esencia, la facultad del Gobernador de Puerto Rico para designar al Juez Presidente o a la Jueza Presidenta del Tribunal Supremo de Puerto Rico. Subsiguientemente, el licenciado Torres Montalvo presentó ante este Tribunal un recurso de certificación intrajurisdiccional en el que nos solicitó que certificáramos la controversia planteada ante el Foro Primario.

Ante este trámite procesal, todos los Jueces y Juezas de este Tribunal coincidimos en que el presente caso debe ser atendido mediante el recurso de certificación. Ahora bien, independientemente de los méritos - o deméritos como plantean algunos distinguidos miembros de este Foro - del planteamiento de los demandantes sobre la presunta

facultad del Gobernador de designar al Juez Presidente de la Rama Judicial, la realidad es que este asunto que **no** queda adjudicado en la determinación que hoy toma este Tribunal porque quien lo trae ante nuestra consideración no tiene legitimación activa.[146] Así, las expresiones que formulan hoy cinco compañeros Jueces y Juezas no constituyen más que un dictum o simple tinta sobre papel que no sienta precedente alguno en nuestra jurisdicción.

Y es que tomar de otra manera el inverosímil curso decisorio de cinco miembros de este Alto Foro supondría no meramente una liberalización de la doctrina de legitimización activa, sino la erradicación total y absoluta de ésta en nuestra jurisdicción. Estableciendo así, o más bien pretendiendo establecer, el desafortunado precedente de que a partir de ahora cualquier persona puede hacer cualquier reclamación ante la violación de cualquier ley sin tener la necesidad de exponer daño específico alguno. Peor aún, a partir de hoy sería improcedente que nuestros Jueces y Juezas ausculten, como paso previo a la adjudicación de un caso, si la parte promovente tiene algún interés legítimo en su reclamación. **Quedan hoy todos informados que conforme a la tinta de cinco miembros de este Foro los tribunales tienen carta**

---

[146] Así concluyó, incluso, la compañera Juez Asociada Rodríguez Rodríguez hace apenas tres años en Nieves Huertas et al. v. ELA I, 189 DPR 611, 627-628 (2013) donde expresó lo siguiente:

> Aunque concluye [la mayoría del Tribunal] que los demandantes no tienen legitimación activa para instar el pleito de epígrafe, el Tribunal insiste en resolver el asunto en los méritos y determinar que los nombramientos en cuestión son válidos. **Sabemos que una vez se concluye la falta de legitimación activa, lo único que procede es la desestimación de la causa.** En cambio, los jueces que en esta ocasión componen el Tribunal resuelven los méritos de las demandas, en contravención a las doctrinas de justiciabilidad y de autolimitación judicial. (Énfasis suplido).

**blanca para intervenir en los méritos en cuanta controversia entiendan pertinente en total inobservancia de los elementos más básicos de justicibialidad y a expensas de cualquier distorsión que tal acción pueda suponer a las funciones propias de la Rama Judicial.**

Ante este ejercicio, valga preguntarnos dónde está la opinión disidente de la compañera Juez Asociada señora Rodríguez Rodríguez alegando violación a "los principios de autolimitación judicial" y su trillado discurso sobre el "uso abusivo del recurso de certificación por este Tribunal".[147] No le quepa duda a nadie que hoy esa compañera presta su voto para emitir una opinión no porque interesa seguir una línea cónsona a lo presuntamente realizado en el caso de Nieves Hueras et al. v. ELA I, 189 DPR 611 (2013), sino porque simple y sencillamente **le conviene a sus intereses particulares** lo que hoy erróneamente opta por adjudicar este Tribunal.

Obviando ese punto que la compañera en su momento deberá explicar, en segundo orden intereso abordar varias expresiones formuladas por algunos líderes sobre una supuesta confabulación de varios miembros de este Tribunal para nombrar al próximo Juez Presidente. Así, en medio del proceso de confirmación de la hoy Jueza Presidenta, éstos - en ánimo de llevar a sus compañeros senadores y senadoras a considerar vía descargue la nominación realizada por el Gobernador de Puerto Rico - pusieron en funciones su imaginación e inventaron el risible e inverosímil pretexto de que contaba con "información

---

[147] Nieves Huertas v. ELA I, supra. (Voto particular de No Intervención del Juez Presidente señor Hernández Denton, la Jueza Asociada señora Fiol Matta y la Juez Asociada señora Rodríguez Rodríguez).

fidedigna" de que varios miembros de este Tribunal pretendían adjudicarse la facultad de designar a un Juez Presidente. Conforme a esa conspiración imaginaria sostenida por el Presidente del Senado, éste llegó al extremo de expresarle a los medios de comunicación que tenía "información fidedigna de que esa posibilidad era real y esa posibilidad era una agenda de algunos senadores del Partido Nuevo Progresista y de alguna gente que estaban confabulándose con algunos abogados y aparentemente estaban recibiendo unos oídos bastante receptivos en algunas personas que ocupan hoy la posición de jueces del Supremo".[148]

Como Juez Asociado de este Alto Foro siempre he procurado guiar mis funciones adjudicativas en el más profundo respeto por el equilibrio constitucional que debe prevalecer entre las tres ramas constitucionales de gobierno. Ello, enmarcado en una patente deferencia a las ramas hermanas en el ejercicio propio de sus facultades. En ese sentido, no albergo duda de que el Senado de Puerto Rico tiene la potestad de ejercer sus prerrogativas constitucionales hasta el momento reconocidas de la manera que entienda conveniente dentro del parámetro de la ley y nuestra Constitución.

Ahora bien, las expresiones desafortunadas emitidas por el Presidente del Senado que pretenden arrastrar y lacerar la legitimidad y confianza del Pueblo en este Alto Foro y en sus miembros, no deben pasar desapercibidas y muchos menos deben ser ignoradas por quienes tenemos el

---

[148] _Bhatia justifica confirmación expreso de Oronoz_, publicado en el periódico digital Noticel, 23 de febrero de 2016 (última visita: 7 de marzo de 2016).

privilegio de servir en nuestro Máximo Foro Judicial. Resulta inaceptable y totalmente reprochable que se pretenda utilizar a este Tribunal como excusa para ejercicios que atentan contra la democracia y que son inconsecuentes a sus discursos. Cada cual debe asumir la responsabilidad propia de sus acciones.

Por último, debo señalar que disiento de la determinación de este Tribunal de imponer honorarios de abogados al licenciado Torres Montalvo. Contrario a la idea que pretende promulgar la opinión mayoritaria, la controversia planteada por el peticionario es una de continuo debate en la comunidad jurídica, como bien menciona la compañera Jueza Asociada señora Pabón Charneco en su Opinión concurrente en parte y disidente en parte. A tal grado, que la mayoría no puede tan siquiera emitir una respuesta clara y precisa, sino que tiene que incurrir en todo en un ejercicio de interpretación de qué realmente se quiso disponer en la Constitución. Ante ello, y contrario a lo que ocurrió en casos anteriores, resulta totalmente improcedente catalogar como frívolos los planteamientos del peticionario e imponer honorarios de abogado.


Edgardo Rivera García
Juez Asociado